Raul Perez (SBN 174687)
Raul.Perez@capstonelawyers.com
Melissa Grant (SBN 205633)
Melissa.Grant@capstonelawyers.com
Arnab Banerjee (SBN 252618)
Arnab.Banerjee@capstonelawyers.com
Ruhandy Glezakos (SBN 307473)
Ruhandy.Glezakos@capstonelawyers.com
Capstone Law APC
1840 Century Park East, Suite 450
Los Angeles, California 90067
Telephone:    (310) 556-4811
Facsimile:    (310) 943-0396

Attorneys for Plaintiffs Sandy Bell
And Martin Gama

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| SANDY BELL and MARTIN GAMA, individually, and on behalf of other members of the general public similarly situated, and as aggrieved employees pursuant to the Private Attorneys General Act ("PAGA"),<br><br>Plaintiffs,<br><br>vs.<br><br>HOME DEPOT U.S.A., INC., a Delaware corporation; JOHN BROOKS, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:12-cv-02499-JAM-CKD<br><br>[Assigned for All Purposes to Hon. John A. Mendez]<br><br>*Jam*<br>[~~PROPOSED~~] ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Date:      February 26, 2016<br>Time:      1:30 p.m.<br>Dept.:      6 |

1

## [PROPOSED] ORDER

2   On February 23, 2016, at 1:30 p.m., in Courtroom 6 of the above-entitled

3   Court, Home Depot's Motion for Partial Summary Judgment and to Stay Class

4   Certification Proceedings came on for hearing before this Court.  The parties

5   appeared through their counsel of record.  The Court GRANTS in part and

6   DENIES in part defendants' motion.

7   The Court GRANTS defendants' motion on the following claims:

8       1. Plaintiffs' claim that Home Depot violated California law by

9          requiring employees to remain on premises during rest breaks.

10      2. Plaintiffs' claim that Home Depot violated California law by failing

11         to include "Success Sharing" bonuses in the calculation of meal

12         period and rest break premiums.

13      3. Plaintiffs' claim that Home Deport underpaid overtime by failing to

14         include "Success Sharing" bonuses in calculating the "regular rate of

15         pay."

16  The Court DENIES defendants' motion on the following claim:

17      1. Plaintiffs' claim that Home Depot failed to pay all required overtime

18         to employees who worked shifts over eight hours that spanned two

19         workdays.

20  The reasons for the Court's Order are set forth in the transcript of the

21  February 23, 2016 hearing, which is attached as **Exhibit A** and incorporated by

22  reference herein.

23  **IT IS SO ORDERED.**

24

25  Dated: ___6·6·2016___                    _____

26                                           Hon. John A. Mendez,
                                             United States District Court Judge,
27                                           Eastern District of California

28

---

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


SANDY BELL, MARTIN GAMA,
et al.,

          Plaintiffs         Case No. 2:12-cv-02499

     vs.                    Sacramento, California
                           February 23, 2016
HOME DEPOT, et al.,         2:00 p.m.

          Defendants.
_____ /


MOTION FOR PARTIAL SUMMARY JUDGMENT
BEFORE THE HONORABLE JOHN A. MENDEZ
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:        CAPSTONE LAW APC
                         BY:  MELISSA GRANT
                             ARNAB BANERJEE
                        1840 Century Park East, Suite 450
                        Los Angeles, California 90067


For the Defendants:        AKIN GUMP STRAUSS HAUER & FELD LLP
                         BY:  DONNA MEZIAS
                             JOEL M. COHN
                        580 California Street, Suite 1500
                        San Francisco, California 94104


Court Reporter:            DIANE J. SHEPARD, CSR 6331, RPR
                         Official Court Reporter
                        501 I Street, Rm 4-200
                        Sacramento, California 95814
                        (916) 554-7460


Proceedings reported by mechanical stenography, transcript
produced by computer-aided transcription.

```
 1              THE CLERK:  Civil 12-2499, Bell versus Home Depot
 2    U.S.A., Inc.
 3              MS. GRANT:  Good afternoon, Your Honor.  Melissa Grant
 4    with Capstone Law on behalf of the plaintiffs.
 5              MR. BANERJEE:  Good afternoon.  Arnab Banerjee also on
 6    behalf of plaintiffs.
 7              MS. MEZIAS:  Good afternoon, Your Honor.  Donna Mezias
 8    and Joel Cohn on behalf of defendant, Home Depot.
 9              THE COURT:  Have a seat.  Put the microphones in front
10    of you.
11         Out of curiosity only, why would plaintiffs who are -- at
12    least the two named plaintiffs, who are from the Los Angeles or
13    Southern California area -- and Ms. Mezias, you're from San
14    Francisco, right?
15              MS. MEZIAS:  Yes, Your Honor.
16              THE COURT:  Is Akin Gump still in this?
17              MS. MEZIAS:  Yes.
18              THE COURT:  So they're from Los Angeles as well.  And
19    then defense counsel, I believe, aren't you from Los Angeles as
20    well?  Everybody is from L.A.  Plaintiffs' counsel, I'm sorry.
21              MS. GRANT:  Yes.
22              THE COURT:  I said defense.  I'm sorry.
23         Ms. Grant and Mr. Banerjee, you're also both from Los
24    Angeles, right.
25              MS. GRANT:  Yes, we are.
```

3

```
1          THE COURT:  What I'm leading up to is, why are we in
2    Sacramento?  Is there something special about Sacramento that I
3    don't know about?
4          MS. GRANT:  To tell you the truth, Your Honor, I don't
5    recall.  I know there was a specific reason for it.  It may have
6    been where the stores where they -- our clients worked, but I'd
7    have to refresh my recollection by looking through some of my
8    materials.
9          THE COURT:  I thought your clients were from
10   Los Angeles.
11         MS. GRANT:  He may have lived in -- they may have
12   lived in Los Angeles.  Let me double check.
13         THE COURT:  Okay.  And then the defendants removed to
14   this district, which is usually required, because the case was
15   filed in Sacramento County Superior Court.
16      But you, in effect, waived any forum non-convenience or
17   venue issues.  That's curious to me as well.
18         MS. MEZIAS:  I'll take a look at the complaint, Your
19   Honor.  The case was filed, I think, in 2012.  So it's been a
20   while.
21         THE COURT:  I know.  All right.  Well, it was just a
22   question out of curiosity.  It's here.  I'll deal with it.
23      Plaintiff, Sandy Bell, is a resident of Santa Ana in Orange
24   County, and Martin Gama is a resident of Newberry Park in
25   Ventura County.  Interesting.
```

4

1    This is a motion for partial summary judgment brought by

2  Home Depot.  There are now six theories of liability.  The

3  defendants are challenging four of the six theories in this

4  motion.  Correct?

5        MS. MEZIAS:  That's correct, Your Honor.

6        THE COURT:  Okay.  There was also a request to stay

7  the motion for class cert.  That now has been fully briefed, as

8  far as I know -- or it will be, and it's supposed to be heard on

9  March 8th.

10       MS. MEZIAS:  It's been fully briefed, Your Honor, as

11  to the two other theories.  However, if the Court were to deny

12  summary judgment on any of the four theories that we've moved on

13  in connection with this motion, we would like the opportunity to

14  oppose class cert on those theories.

15       MS. GRANT:  Your Honor, we would object to that.  The

16  defendant chose not to oppose certification of the claims that

17  are at issue in this summary judgment, and instead referred the

18  Court to their arguments in the summary judgment motion.  I

19  don't think it would be appropriate for them to get another

20  chance at it.

21       MS. MEZIAS:  It's not another chance, Your Honor.

22       THE COURT:  I don't either.  Why would you do that?

23  Why would you take that risk?

24       MS. MEZIAS:  Your Honor, we believe that the motion

25  for summary judgment should have been determined first.  With

1   respect to most of the four theories on which we have moved,

2   these were brand new theories that were pled or alleged by

3   plaintiffs in connection with their class certification motion,

4   and that's why we moved for summary judgment.

5       These were brand new theories.  They were not alleged in the

6   complaint.  The on-premises rest break theory that they've

7   alleged is nowhere alleged in the complaint.  The Success

8   Sharing bonus for the overtime calculation was not alleged in

9   the complaint.

10          THE COURT:  So you took the risk that I would allow

11  you to further brief?

12          MS. MEZIAS:  Your Honor, we made a motion and we

13  would --

14          THE COURT:  And it's being decided before your class

15  cert motion, isn't it?  It's going to be decided today.  So you

16  still took the risk, didn't you?  Calculated risk.

17      There is no way I would grant additional briefing.  I just

18  think that's a risk that you shouldn't have taken.  It was your

19  choice.  But we'll go through, and I will rule on this motion

20  today.  So you will have a ruling, and then we'll deal with the

21  class cert issue on March 8th.

22      But I agree with the plaintiffs.  You had a shot.  Depending

23  on what I do today, you may not have to -- well, you won't have

24  a chance to brief anything further, but we're going to have oral

25  argument on the class cert motion.  So I'm obviously not going

1    to preclude you from raising arguments at the hearing, but I am

2    not going to permit any further briefing.

3             MS. MEZIAS:  Your Honor, to be fair, Your Honor, we

4    obviously felt strongly about these four theories, which is why

5    we moved only as to these on summary judgment.

6             THE COURT:  I know.  We'll get to them.

7        These are incredibly complicated, complex.  And you all

8    have, obviously, much more familiarity with the facts.  Some of

9    my questions may seem very basic.

10       I think in reviewing the briefs, the papers in support, and

11   any other documents with respect to this motion that it really

12   does, in most cases, come down to a legal issue.  There isn't a

13   lot of factual dispute.  And so I think it is appropriate to

14   decide, and I can decide some of these issues -- if not some,

15   all of these issues today and give you some guidance moving

16   forward.

17       I'm going to go in reverse, though, because the most

18   complicated part of this case, to me, is this Success Sharing

19   portion and that bonus.

20       The six theories of liability, as I understand them, are,

21   first, what I call the Success Sharing claim or the failure to

22   pay overtime at the correct regular rate.  I'm going to take

23   that up last.  The next theory of liability is the failure to

24   pay meal and rest break premiums at the correct regular rate.

25       There is a third theory of liability, which isn't being

7

1  challenged in this motion.  That's the failure to provide

2  employees with the correct number of rest breaks, right?  That's

3  not part of this motion, correct?

4          MS. GRANT:  Correct.

5          THE COURT:  Everybody agree?

6          MS. MEZIAS:  Yes.

7          THE COURT:  Theory of liability.  The failure to

8  provide employees with duty-free rest breaks is part of this

9  motion.  The failure to properly pay overtime for overnight

10  shifts is part of this motion.

11      And then the final theory of liability is the allegation of

12  the failure to compensate employees for required off-the-clock

13  work.  That's not, again, part of this motion.  Everybody agree?

14          MS. GRANT:  Yes, Your Honor.

15          MS. MEZIAS:  Yes, Your Honor.

16          THE COURT:  Okay.  All right.  I want to take up,

17  actually, the one I think is -- maybe you two will disagree --

18  but is the easiest.  And that's the rest break theory, as I call

19  it.

20      Employers are required to provide non-exempt employees with

21  ten-minute paid rest breaks at certain intervals.  Because rest

22  breaks are paid, employers may require employees to remain on

23  the premises.  That's the Klune case cited by the defendants.

24      There's also a Labor Commission Office Frequently Asked

25  Questions regarding rest periods found in the Department of

1    Industrial Relations website.  And that provides that employees

2    can be required to remain on the employer's premises during rest

3    periods.  These are the authorities cited by the defendants.

4    And these interpretations are usually given great weight in

5    cases such as this.

6        In response, the plaintiffs point to a number of cases that

7    they believe are in opposite.  The Morillion versus Royal

8    Packing Company case in which it was held that workers who were

9    required to travel to the work site on an employer-provided bus

10   should be compensated for the time because the workers were not

11   free to pursue personal activities.

12       There is the Aguilar versus Association for Retarded

13   Citizens case which held that a group home employer was required

14   to compensate attendance for the entire nighttime shift even if

15   the attendant slept because they were on call.

16       There is the Bono Enterprises versus Bradshaw case which

17   analyzed on-premise meal periods.

18       But none of the cases that I saw from the plaintiffs

19   specifically analyzed this specific issue, which is a ten-minute

20   paid rest break.  And I didn't see anything in the opposition

21   that would lead me to conclude that what Home Depot is doing

22   isn't authorized, and, therefore, would not provide a basis for

23   liability against Home Depot because they didn't allow the

24   employees to take a rest break off premises.  Is there something

25   I missed?

1          MS. GRANT:  May I be heard, Your Honor?

2          THE COURT:  Yes.

3          MS. GRANT:  There is not specifically a case directly

4   on point, but there are two things that are on point.  One is

5   the statute.  The statute says -- 226.7 says that an employer

6   may not require an employee to work during a meal, or rest, or

7   recovery period.

8          Under basic cannons of statutory construction and the

9   Steketee case of the U.S. Supreme Court, when a word is used in

10  a sentence regarding multiple concepts, it isn't said in the

11  exact -- with the exact same meaning as to those concepts.

12         So if you are not permitted to allow an employee to stay on

13  the premises because it is considered maintaining control over

14  an employee, not releasing them from all their duties during

15  their meal break, it is the same for a rest break.

16         The California Supreme Court recently agreed with that

17  interpretation inasmuch as in the Mendiola case, which we do

18  cite, the Mendiola case refers to the Bono case and applies the

19  Bono case principle of when an employer directs, commands, or

20  restrains an employee from leaving the workplace, and, thus,

21  prevents the employee from using the time effectively for his or

22  her own purposes, the employee remains subject to the employer's

23  control.

24         Now in Bono, that was referencing meal breaks.  The Mendiola

25  case, which the California Supreme Court was considering, was

1  strictly a rest break case.  And it regarded the Bono rule from

2  that case applicable in rest breaks.

3      Similarly, it is not -- when it cited Morillion, Morillion

4  -- we did not cite Morillion for the notion that employees are

5  also traveling to work.  The concept is one of under the control

6  of the employer.  Not free to use the time as they wish.

7      There can be no argument that an employee who works at a

8  store and is not permitted to run an errand, go to the bank, go

9  see friends, go pick up food --

10          THE COURT:  It's a ten-minute break.

11          MS. GRANT:  -- do any of those things --

12          THE COURT:  Isn't it a ten-minute break?  How do they

13  do all that in ten minutes?

14          MS. GRANT:  It doesn't matter that it's a ten-minute

15  break.  It's still a break.

16      As the California Supreme Court said in Murphy, the whole

17  concept of a rest break is to give somebody a respite from their

18  work.

19          THE COURT:  Not go pick somebody up, not go to the

20  bank.  To rest, right?

21          MS. GRANT:  To rest as opposed to --

22          THE COURT:  Which is why it's only ten minutes.

23          MS. GRANT:  I also have to disagree with Your Honor

24  with respect to the DLSE FAQs.  As we noted in a footnote, the

25  FAQs are what's called an underground regulation.  They are not

1  entitled to any deference whatsoever because they did not comply

2  with the Administrative Procedure Act, which requires that any

3  pronouncement of general law applicable generally to all

4  employees must go through the review process of the ADA.   That

5  is the -- the APA.   My apologies.

6      In this case, what you have is an FAQ of -- which is

7  essentially speculation.   And that is why it is not entitled to

8  deference.

9      In addition, the -- I'm sorry -- I lost my train of thought.

10         THE COURT:   You were saying that -- I said that they

11  should be given --

12         MS. GRANT:   The other important point to keep in mind

13  is --

14         THE COURT:   -- weight.

15         MS. GRANT:   I'm sorry?

16         THE COURT:   Go ahead.   I was just saying, I said that

17  they should be given weight.   You're arguing they shouldn't.

18  But go ahead.

19         MS. GRANT:   The other important point to keep in mind

20  is the wage orders.   The IWC Wage Orders, which are given the

21  same effect as a statute, they are very clear in the rules that

22  they apply.   Wage Order 7 is the wage order that governs the

23  retail environment, and, therefore, Home Depot.

24      Wage Order 7 does not permit on-the-premises rest breaks.

25  Wage Order 5 for restaurants does for the reason you just spoke

12

```
 1    of, which is it's a restaurant.  They don't want to -- they want

 2    them to stay on the premises because it's only ten minutes.

 3         Similarly, in Wage Order 12 -- is it 12 or is it 11?

 4              THE COURT:  So is your theory because they're staying

 5    on the premises -- they're being paid for the ten minutes?

 6              MS. GRANT:  That's --

 7              THE COURT:  Hang on.  They're being paid for the ten

 8    minutes, right?

 9              MS. GRANT:  Uh-huh.

10              THE COURT:  So your theory is, because they're being

11    made to stay on the premises they're really working?

12              MS. GRANT:  They are --

13              THE COURT:  Explain your theory to me.

14              MS. GRANT:  The rule of working and hours worked is

15    defined in California law.  It's different than federal law.  It

16    is distinctly different than federal law.

17         Under California law, it's whether or not you are subject to

18    the control of the employer.  It's not about whether or not

19    you're hired to do something or not.  It is about whether you

20    are subject to the control of the employer.

21         In addition, the California Supreme Court in Murphy

22    specifically rejected the notion that because they're paid, they

23    can be asked to do work.  If that were the case, it would be --

24    they could be asked to do any work because you're paid.  Why

25    can't you work?
```

1     That's why the California Supreme Court in Murphy said that

2   if you were to require an employee during their rest period to

3   work, they should be paid again.  Because they are paid to take

4   a rest break, but they're not paid to work.

5          THE COURT:  If they go outside to smoke during this

6   rest break, but they're still on the premises.

7          MS. GRANT:  They're not allowed to do that.  They are

8   not allowed to leave the store premises.  They're not allowed to

9   go outside and take a rest break.  They're not allowed to go

10   outside for any reason.

11          THE COURT:  They have to stay where they're at.

12          MS. GRANT:  They have to stay on-site and therefore,

13   under the control of employer.

14          THE COURT:  So Ms. Mezias, what about Mendiola?

15   Because I don't think you addressed it in your reply brief.

16          MS. MEZIAS:  I thought we did, but I'll certainly

17   address it now, Your Honor.

18     Mendiola is not a rest break case.  Mendiola is a case about

19   sleep time and whether the conditions were such that the

20   employees even during their sleep time were subject to the

21   control of the employer so that the time had to be considered

22   hours worked and compensated.  That is a different concept from

23   whether someone is actually working.

24     I agree with counsel that the statute says you're not

25   allowed to require an employee to work during a rest break or a

1    meal break.  There is no allegation here that they are actually

2    working or being required to work.  The only question is, can

3    they leave the premises?

4        Both the Mendiola case, and the Morillion case as well, what

5    those cases were addressing is whether the employee is subject

6    to the control of the employer such as the time is considered --

7    and this is a term-of-art concept -- hours worked and

8    compensable.

9        Rest breaks are considered hours worked and compensable.

10   They're paid.  You stay on the clock during a rest break.  And

11   the only question is whether because it's compensable time can

12   there be some slight restriction on their activities.  Not are

13   they required to work, but can there be a slight restriction.

14       And that's where both the Klune case -- and the Klune case

15   expressly did agree with the logic that is expressed by the DLSE

16   on its website that because those rest breaks are considered

17   time worked already, counted as hours worked and paid, they --

18   the employer can require the employee to remain on the premises.

19   A very slight restriction on their activities.  It is

20   fundamentally different from a meal period, which is unpaid and

21   not considered hours worked.

22           MS. GRANT:  Your Honor, may I respond to that?

23   Because I have a specific argument in response to that.

24           THE COURT:  Go ahead.  Briefly.

25           MS. GRANT:  Two aspects to it.  If, in fact, rest

1  breaks were hours worked, there would be no reason for the wage

2  orders to say - and rest breaks are to be counted as hours

3  worked.  The very fact -- in other words, time that's paid --

4  the wage order doesn't say you count time that's paid as hours

5  worked.  Hours worked includes both exertion and hiring to sit

6  and wait.  You don't -- it's called suffering -- I forget the

7  exact terminology.  But you literally can hire somebody to do

8  nothing.  That's still hours worked.

9       There is no concept in California law, and as a matter of

10  fact there is a California -- a U.S. Supreme Court case, which I

11  will be glad to get Your Honor, that specifically rejected the

12  notion that working has to involve any exertion.  It is simply

13  being subject to the control of the employer, suffered or

14  permitted to work.  That is hours worked.

15      If rest breaks were hours worked, there would have been no

16  reason for the wage order to say that.

17             THE COURT:  How do you distinguish Klune?

18             MS. GRANT:  How do I distinguish what?

19             THE COURT:  Klune.  Klune versus Ashley Furniture,

20  which they cite in their reply brief.

21             MS. GRANT:  I think Klune erred in relying on the

22  FAQs.  I don't believe it was pointed out to the court in

23  Klune --

24             THE COURT:  It was a rest break case though, right?

25             MS. GRANT:  Yes, it was a rest break case.  It's a

1    district court case so it doesn't have precedential value.

2          THE COURT:  Well, it helps because there is no case

3    that you cite which specifically deals with this issue whereas

4    Klune does, right?

5          MS. GRANT:  Well, you could adopt its reasoning, but

6    its reasoning is based on an FAQ on the website, which is

7    considered a void, underground regulation, entitled to no

8    deference.

9          THE COURT:  I understand the argument, but it is the

10   only case that is nearly identical to this case before me.

11         MS. GRANT:  Well, interestingly enough, there is a

12   case before the California Supreme Court right now.

13         THE COURT:  Doesn't matter to me.  It's not been

14   decided, right?

15         MS. GRANT:  No.  But you might want to hold this issue

16   in abeyance until the court rules because it will make this

17   issue very clear.

18         THE COURT:  We'll see.  I understand this argument.

19     I agree with the defendants on this issue.  I thought this

20   was going to be the easy one.  Apparently not that easy.

21     I am granting summary judgment on this part of the motion.

22   Finding that as a matter of law that liability cannot be

23   premised on the theory that the employer required the employees

24   to stay on the premises.  Relying on the Klune versus Ashley

25   Furniture case, and other cases cited by the defendants in

1   support of their motion on this issue, as a matter of law I

2   think and I believe that that liability and that theory of

3   liability cannot go forward.  So on that one I am granting

4   summary judgment.

5       I want to turn to the theory of liability of the failure to

6   compensate employees -- I'm sorry -- failure to properly pay

7   overtime for overnight shifts.

8       As I understand this one, if you work at Home Depot, and you

9   start at 5:00 in the afternoon, and you work until 1:00 in the

10  morning -- let's say you work until 3:00 in the morning, that

11  would be eight hours and two hours of overtime, let's say.

12      But that's not the way Home Depot looks at it, right?  Home

13  Depot views that as two separate days.  There wouldn't be any

14  overtime under that scenario.  Am I understanding that right?

15  Because Home Depot uses a midnight to -- or 12:00 a.m. to 12:00

16  midnight day.

17          MS. MEZIAS:  What Home Depot does, Your Honor, is

18  based on Labor Code Section 510(a), which says you base overtime

19  on the workday, it has a workday that is the same as the default

20  workday under California law that the DLSE designates.  Midnight

21  to midnight.

22      So if the only overtime -- if the only shift in your

23  hypothetical example that an employee worked was seven hours on

24  one workday, and two hours on the next, it would not be overtime

25  for that particular shift.  That is correct.

18

1      If, however -- but when overtime is determined, you look at

2  what other hours are worked during the workday.  If the employee

3  comes back in at 5:00 again, right, or in the work week.

4            THE COURT:  Okay.

5            MS. MEZIAS:  But, yes, your hypothetical is correct.

6            THE COURT:  And this was the same issue, when I looked

7  at this case, again from the Northern District, recently

8  decided, Henry versus Home Depot -- were you the lawyer on that

9  one, too?

10            MS. MEZIAS:  Yes, Your Honor.

11            THE COURT:  So you know much more about it than I do.

12      But apparently in that case the same issue was in front of

13  that district judge.  Whether Home Depot's designation of a

14  midnight-to-midnight workday violated overtime laws.

15      By the way, were you involved in that one, too?

16            MS. GRANT:  No.

17            THE COURT:  And then the court in Henry adopted the

18  reasoning of a case called Jakosalem, J-a-k-o-s-a-l-e-m, which

19  held that employers are not required in all instances to define

20  each employee's workday to begin with that employee's shift.

21      But the court stated that, in spite of that holding the

22  court must still address the question of whether Home Depot has

23  shown as a matter of law that its workday was not designed

24  primarily to evade overtime compensation.  Quoting another Court

25  of Appeals case from California, Seymore.

1    The district court in Henry reasoned that Home Depot had

2    failed to submit any direct evidence regarding the purpose

3    behind the workday definition.  In this case, you've given me

4    percentages.  In Henry, Home Depot submitted payroll records

5    showing the percentage of Home Depot employee shifts occurring

6    within the designated workday and asked the court to infer that

7    because Home Depot's workday definition coincides with the

8    shifts of over 90 percent of its California employees, it's

9    clear that Home Depot's workday was not defined to evade paying

10   overtime.

11   But the Henry court rejected that argument reasoning that

12   this evidence and the reasonable inference to be drawn from it

13   do not point in only one direction, and, therefore, the court

14   held that a reasonable jury might conclude, contrary to Home

15   Depot's assertion, that the workday definition was designed to

16   avoid paying the employees overtime.

17   So I went back and looked at your papers in support of this

18   motion, and I'm not certain if you met that judge's concerns

19   because I have the same concern.

20   Is there something that you think that I may have missed

21   that does explain to me or makes it clear that this wasn't

22   designed to evade paying overtime that wipes out that inference?

23   Because I'm inclined to go along, again, with this judge from

24   the Northern District and say that's just one a jury is going to

25   have to decide.

1       As much as it's only an inference, and you obviously have

2  strong evidence, the inference is there.  And because there is

3  that inference, it's not something that I can decide as a matter

4  of law.

5       MS. MEZIAS:  Your Honor, I think there are two very

6  important things that are different from the Henry decision that

7  you should consider.

8       THE COURT:  Okay.

9       MS. MEZIAS:  One is the -- there is evidence in the

10  declaration from Christine Barnaby submitted with our moving

11  papers --

12       THE COURT:  I saw that.

13       MS. MEZIAS:  -- in paragraph 9.

14       THE COURT:  She says the calendar day workday aligns

15  with store business hours when most store employees are

16  scheduled to work to ensure sufficient staffing to meet customer

17  demand.

18       MS. MEZIAS:  Right.  That is direct evidence of the

19  business purpose for the workday definition as Home Depot has

20  defined it.

21       Incidentally, I respectfully disagree that we have that much

22  of a burden on this motion when we have shown that the

23  overwhelming majority of shifts align with the schedules of and

24  work hours of employees.

25       And that's where I would direct Your Honor to the Cummings

1   case, which says we need not produce such evidence at this stage

2   when the schedules do align, and to the Seymore versus Metson

3   Marine case, which came out the other way but very clearly

4   discusses the significant discretion that the employer has in

5   defining the workday, but made its decision because it was clear

6   that in that case the schedules of the employees differed from

7   the workday as defined.

8           THE COURT:  Doesn't that still come down to whether a

9   jury is going to believe that or not?

10   .I know you could put her up on the stand, and she could

11   testify.  You've got all the percentages, evidence.  But there

12   is still that inference --

13           MS. MEZIAS:  Your Honor --

14           THE COURT:  -- which is enough to raise a triable

15   issue.

16           MS. MEZIAS:  I don't think so, Your Honor.

17   I think according to the Cummings case and the Seymore

18   versus Metson Marine case, which is a California appellate

19   decision, we have no such burden at this stage when we have

20   shown that the work schedules align.

21       But very significantly, beyond that, and even though we've

22   provided direct evidence of that, the other thing that is very

23   different here from the Henry case is that the judge in that

24   case relied significantly on the fact that there were

25   declarations from the plaintiff that his supervisors told him to

1    work a short shift if he came in after working past midnight to

2    avoid accruing overtime.

3        And while the judge said that may be susceptible of many

4    inferences, including some that are in fact favorable to Home

5    Depot, he felt that that evidence perhaps raised an inference

6    that he could not ignore on summary judgment.

7        No such evidence is present here.  We don't have that.  The

8    only declarations that the plaintiffs point to are declarations

9    that say that Home Depot's strict policy against overtime

10   allegedly caused them to work off the clock.  That's got nothing

11   to do with this claim.

12       The Cummings case, I would just point out, Your Honor, was a

13   case where the Central District granted summary judgment in

14   favor of the employer without requiring any other indication of

15   the intent behind the workday definition because the shifts

16   aligned with the workday.

17       And the Court was very clear that that simply was not going

18   to be a burden that the employer had on summary judgment where

19   it has made a showing, as we have here, that the overwhelming

20   majority of shifts align.

21       And let's look at just the two plaintiffs here.  The motion

22   is directed to the two plaintiffs.  Over 97 percent of the

23   shifts lined up.

24            THE COURT:  I understand that.

25            MS. GRANT:  Your Honor, may I?

1          THE COURT:  Go ahead.  Tell me why Cummings doesn't

2    control and what other evidence you've raised or put forth that

3    supports this inference that I talked about.

4          MS. GRANT:  Two things.  First of all, in Cummings

5    there was no evidence that there were any alternate shifts.  The

6    only evidence in the record were -- was evidence of shifts that

7    aligned with the workday.  So it was clear there was no reason

8    not to grant summary judgment in that case.

9       In our case --

10          THE COURT:  I'm not following.  I don't understand

11    that argument.

12          MS. GRANT:  In other words, there was no evidence,

13    like in the Jakosalem case, where the court pointed out even if

14    there's a minority of shifts that do not align, they could very

15    easily involve employees who earn a greater base hourly rate,

16    and would therefore earn a significant amount of overtime.

17       In our case, we put forward evidence from our expert,

18    Dr. Fountain, who demonstrated that there are -- the overtime

19    rules significantly affects those who work overnight shifts more

20    than it affects those who work day shifts.  That the length of

21    overtime worked in overnight shifts was 3.5 times greater than

22    the length of overtime worked during day shifts.  This is a

23    significant -- these are two significant facts.

24       And the law would have permitted Home Depot to have had two

25    different definitions of workdays.  The fact that they have

1    offered no bona fide reason why they did not define workdays for

2    those who work overnight and overtime as opposed to those who do

3    not is why they are not entitled to summary judgment.

4        The law says that they must meet a high burden, a strictly

5    interpreted burden, to exempt themselves from paying overtime.

6            THE COURT:  The calendar day workday aligns with store

7    business hours when most store employees are scheduled to work

8    to ensure sufficient staffing to meet customer demand.

9            MS. GRANT:  That does not explain the fact that there

10   are ten percent of shifts -- and we're talking about a lot of

11   employees.  Ten percent of shifts.  Were not talking about a few

12   hundred.  We're talking about thousands.

13       These employees tend to work 3.5 times more overtime than

14   those who work during the day shifts.  That is significant, and

15   that is exactly why the Henry court cited to the Jakosalem case.

16       Just because it's a minority of shifts does not mean it is

17   not a significant amount of overtime.  It is defendant's burden

18   to prove why -- what the bone fide reason was for not defining

19   the workday differently for those who worked overnight.  The

20   only explanation is they don't have to pay overtime.  They could

21   have done that.

22           THE COURT:  Your clients -- Ms. Mezias, I cut you off

23   -- but their percentages, the two named plaintiffs, their

24   percentages were significantly low, weren't they?

25           MS. MEZIAS:  Of overnight shifts?

1          THE COURT:  Right.

2          MS. MEZIAS:  That's correct, Your Honor.

3      So for Mr. Bell, 97 percent of his shifts began and ended on

4  the same workday.

5          THE COURT:  Right.

6          MS. MEZIAS:  For Mr. Gama, it's 98.5.  Meaning that

7  only 1.5 percent of his shifts ever even crossed midnight.

8      Your Honor, if I could just respond briefly --

9          THE COURT:  We're sliding over into whether they are

10  representative of a class.  That causes me concern that your two

11  named plaintiffs may not be representative of your class.

12  Because you're now talking about ten percent, and you're talking

13  about higher percentages.

14          MS. GRANT:  Their obligation to represent the class is

15  not in terms of degree.  It's in terms of kind.  The fact that

16  they worked overnight shifts and were not paid overtime during

17  those overnight shifts is what renders them typical of the class

18  and adequate to represent them.

19      They don't have to have earned the same amount of overtime

20  as everybody in the class.  They simply must have had the

21  circumstance that everybody who worked overnight shifts --

22          THE COURT:  I didn't mean to shade over into the next

23  motion.

24          MS. MEZIAS:  Your Honor, may I respond briefly on this

25  point.  Because I didn't address the Fountain declaration, and I

 1   would like to.  We did discuss it a bit in our reply brief.

 2       The Fountain declaration provides some analysis of numbers,

 3   but it doesn't provide any analysis that's relevant to this

 4   issue.  He talks about the numbers of overnight shifts and the

 5   length of overnight shifts but does not make any connection

 6   between that and the loss of overtime.

 7       He's simply asking the Court, as the plaintiffs are doing,

 8   to assume that employees are deprived of overtime.  There is no

 9   basis for that.  In fact, as we discussed before, it depends on

10   whether the hours worked in the workday or the work week add up

11   to more than eight for the workday or more than 40 for the work

12   week, and that may happen and does happen many times.

13       We used a couple of examples in our reply brief to show you

14   that in fact even when shifts cross midnight people get

15   overtime.  In fact, we gave you a couple of examples of where

16   plaintiff Bell, himself, ended up getting more overtime as a

17   result of the workday definition than he would have had he been

18   paid on a shift basis.

19           THE COURT:  What about the declarations from the named

20   plaintiffs and then the eight other Home Depot employees who

21   have submitted declarations testifying that Home Depot used --

22   at least suggesting that they used the overnight overtime policy

23   to avoid paying overtime - Perez, Miranda, Stephen Jackson,

24   Musick, Dennis Pawson, Chad Rabideau and Linette Stamper and

25   Dane Turner, along with the named plaintiffs.

1          MS. MEZIAS:  Your Honor, there is --

2          THE COURT:  Shouldn't I be concerned, again, that that

3     at least is enough to raise a triable issue?

4          MS. MEZIAS:  No, Your Honor.

5          THE COURT:  Why not?

6          MS. MEZIAS:  Because they don't say anything about

7     that.  They simply speculate that that may have been Home

8     Depot's reason for the workday ending at midnight.

9          That's very different -- and again -- although we disagree

10    with Judge Tigar -- that's very different from the kind of

11    evidence that was before Judge Tigar where managers had made

12    statements to the plaintiff, allegedly, talking about -- at

13    least he said it could raise an inference that it had to do with

14    the workday definition.

15         Here, all the plaintiffs are saying in their declarations is

16    that the workday ended at midnight, and it automatically clocked

17    me out and clocked me back in.  I think that might be because

18    Home Depot wants to evade overtime.  That's speculation.

19         This is not -- we're at summary judgment now.  You don't

20    defeat summary judgment with speculative statements or asking

21    the Court to make assumptions that are not grounded in evidence.

22         MS. GRANT:  Your Honor, this is a question for the

23    jury.  If the jury wants to believe that the individual class

24    members, whose declarations we submitted, including the

25    plaintiffs, that they believe this is why Home Depot did this,

1    then they can either reject it or not.  That's up for the jury.

2        The defendant is arguing the weight of the evidence, and

3    they are trying to turn on their head the burden of proof.  The

4    burden is for them to prove that employees did not lose overtime

5    pay because of the way they defined, and that they had a bona

6    fide reason for not permitting them to earn overtime.

7            THE COURT:  Okay.  Again, I've heard enough.  I am

8    going to deny the motion for summary judgment on this issue

9    relying on the same rationale as the judge in Henry.

10        While there may be some distinctions, this Court does not

11   feel comfortable as a matter of law finding that there is no

12   material issue or triable issue of fact that is going to decide

13   this issue, and that this evidence that's been submitted by both

14   sides should be and will be decided by a jury if this case goes

15   forward to trial.

16        Relying on Henry, I don't think that there is sufficient

17   evidence to grant summary adjudication that as a matter of law

18   that the Home Depot policy is proper, and, therefore, Home Depot

19   can avoid liability when it designates its workday as it does

20   and in the manner that it does.

21        I can't conclude as a matter of law that this workday

22   designation was not designed to evade overtime law since there

23   are disputed issues of material fact, and the evidence before

24   the Court gives rise to competing inferences.

25        For that reason on that issue I'm going to deny summary

1     adjudication.

2          The other two issues.  The next one I want to take up is the

3     failure to pay meal and rest break premiums at the correct

4     regular rate.  Digging even further into the minutia.  This

5     deals with the language, and is there a difference between

6     regular rate of compensation and regular rate of pay.  Just

7     hurts my head.

8          The defendants believe, very simply, that that is a

9     difference.  It makes a difference.  And the plaintiffs counter

10    that rate of compensation and rate of pay should be interpreted

11    in the same fashion.  I'm oversimplifying your arguments, but

12    that's what I got out of it.

13         Tell me why the defendants are wrong, Ms. Grant.

14              MS. GRANT:  Well --

15              THE COURT:  Other than what you've already said in

16    your briefs, and I've already read, I'll give you a chance to

17    respond to what is in their reply brief on this issue.

18              MS. GRANT:  If I recall, their arguments in the reply

19    brief were to simply rely on the Wert and the Bradescu case,

20    which were decided in 2014.  And neither case actually delved

21    into an analysis of whether the legislature intended them to

22    mean the same thing.

23         They did not refute any of the law that we have cited that

24    very clearly says, including the California Supreme Court in the

25    Costco case, that regular rate is the term of art, and regular

1  rate of pay and regular rate of compensation are used

2  interchangeably.  They are used interchangeably in federal

3  regulations.  They are used interchangeably in federal law, in

4  our statutes - 510, 204.3.  All dealing with overtime.  They're

5  used interchangeably by the DLSE, whose FAQs Your Honor relied

6  on before.  This is a term of art - regular rate.

7          THE COURT:  You rely on the Studley versus Alliance

8  Healthcare Services.

9          MS. GRANT:  Yes.  That specifically analyzed this

10  issue.

11          THE COURT:  But it doesn't specifically address the

12  difference between regular rate of compensation and regular rate

13  of pay.  It doesn't do that.  It talks about regular rate, but

14  it doesn't talk about the phrase regular rate of compensation

15  and regular rate of pay.

16          MS. GRANT:  That's because it focused on the fact that

17  the term of art is regular rate.

18      This is an invention of the defendants to say compensation

19  versus pay are two uniquely different things.  They are not.  In

20  case law, in the statute, in the regulations, federal and state,

21  there is nothing except the Wert and Bradescu case.  And the

22  Bradescu case relied on the Wert case.  So there's really only

23  the Wert case, and the Wert case did no thorough analysis of

24  this issue.

25      The other thing that the defendants argue is that it's

1    really the same as an hourly rate.  But the legislative history

2    makes patently clear that the legislature specifically removed

3    the language hourly rate and replaced it with regular rate

4    because that's the term of art.

5          THE COURT:  Okay.  Ms. Mezias, anything you want to

6    add on this that isn't already in your briefs?

7          MS. MEZIAS:  Only this, Your Honor.  We didn't invent

8    this distinction between regular rate of compensation, regular

9    rate of pay.  We were relying on the two recent cases that do

10   specifically analyze those terms, Bradescu and Wert.

11       And the fact that there is a well-established rule of

12   statutory construction that different phrasing is intended to

13   mean different things.  The legislature could easily have said

14   regular rate of pay in Section 226.7, which is the phrase they

15   use in the overtime statute Section 510(a), but did not.

16         THE COURT:  Right.  On this issue, the Court is going

17   to grant summary adjudication in favor of the defendants.

18       Section 226.7 is a statute governing the conditions of

19   employment, and it must be construed broadly in favor of

20   protecting employees.  The plaintiffs and defendants disagree as

21   to what the legislature meant by regular rate of compensation in

22   this section.

23       The defendants have contended that under California law,

24   meal period and rest break premiums are based on the base hourly

25   rate of pay not the regular rate of pay, which is the language

1  used for overtime purposes.

2      The defendants focus on the legislature's decision to use

3  the term regular rate of compensation as opposed to the term

4  regular rate of pay found in the overtime provisions.

5      In contrast, the plaintiffs have contended that the regular

6  rate, regular rate of pay, and regular rate of compensation all

7  mean the same thing, and that the regular rate must include the

8  total remuneration for employment.

9      The defendant argues that principles of statutory

10  interpretation require this Court to conclude as a matter of law

11  that the regular rate of compensation is meaningfully different

12  from the regular rate of pay used to calculate overtime.

13      Defendants have relied on two cases to support their

14  contention.  Bradescu, in which the court granted summary

15  judgment on plaintiffs' claim that the employer violated 226.7

16  by paying meal break premiums at the base hourly rate instead of

17  the regular rate of pay.  Reasoning that the legislature's

18  choice of different language is meaningful in the absence of

19  authority to the contrary.

20      Similarly, in Wert versus United States Bancorp, the court

21  denied plaintiffs' motion to add a claim that meal period

22  premiums were improperly paid at base hourly rate reasoning that

23  the additional was futile seeing as the plain language of

24  Section 226.7 and 510(a) does not suggest that the phrase

25  regular rate of compensation is synonymous to and may be used

1    interchangeably with regular rate of pay.

2        Plaintiffs have argued that rate of compensation and rate of

3    pay should be interpreted in the same fashion.  In support of

4    their claim, in the arguments plaintiffs have cited to Studley

5    versus Alliance Healthcare Services.  That court in Studley held

6    that the regular rate of compensation owed is the same as the

7    regular rate of pay as stated in Labor Code Section 510, and

8    calculated according to the Fair Labor Standards Act and not the

9    base rate of pay.

10       The court reasoned that because the compensation provided in

11   Section 226.7 is not a penalty but a form of premium wage paid

12   to employees to compensate them for an adverse condition they

13   have encountered during their work hours is akin to overtime

14   pay, which is another form of premium pay.

15       If the legislature carefully employs a term in one statute

16   and deletes it from another, it must be presumed to have acted

17   deliberately.  That's the Ferguson versus Worker's Comp Appeals

18   Board case.

19       While Studley does support plaintiffs' interpretation of

20   Section 226.7, Studley does not address the difference in

21   language between regular rate of compensation and regular rate

22   of pay as in the cases cited by the defendant, and, instead,

23   states that Section 226.7 uses the same language regular rate

24   employed for other premium pay rates such as overtime.

25       Therefore, the legislature's choice to use the word

1   compensation instead of pay in this Court's view is meaningful,

2   and in the absence of authority to the contrary, the Court is

3   led to the conclusion that summary judgment in defendant's favor

4   on this issue should be granted, and the Court does so.

5       The final issue is the Success Sharing issue, as I call it.

6   Apparently, Home Depot has a bonus program, and if certain

7   stores reach a certain amount of earnings, then bonuses are paid

8   on top of, as I take it, what someone would normally make in

9   terms of their regular pay and their overtime pay.

10      So if I make $30,000 the first six months of the year,

11  including -- then that would include my regular rate of pay and

12  overtime.  If the store I work at has done extremely well, then

13  Home Depot has this program where they pay over and above that

14  30,000, this bonus, this Success Sharing bonus, right?

15      Now, is it paid to every employee at the store?  Does

16  everyone share in the Success Sharing?

17          MS. MEZIAS:  I don't know that management employees

18  receive those bonuses, Your Honor.

19          THE COURT:  But the plaintiffs would be --

20          MS. MEZIAS:  Yes.  The plaintiffs would, yes.  Hourly

21  employees, yes.

22          THE COURT:  I don't want to go through the formula

23  because, again, reading the declarations just makes your head

24  hurt.  But you have some calculation, or Home Depot does, where

25  eventually you look at someone's earnings.  You would look at my

1    earnings.  My $30,000.  And I would get a percentage of this

2    bonus pool.

3        I'm trying to oversimplify it, but I'm trying to understand

4    it.  But is that the way it works?

5            MS. MEZIAS:  Your Honor, the complicated part of this

6    is how the bonus pool is determined.  Whether you get to --

7            THE COURT:  That's not really relevant.

8            MS. MEZIAS:  Exactly.  It's not relevant.

9            THE COURT:  Right.

10           MS. MEZIAS:  So the simple part of this is how Home

11   Depot pays it, which is when Success Sharing bonuses are paid,

12   the employees who receive them receive them as a percentage, but

13   in the same percentage of both regular earnings and overtime

14   earnings.

15       So let's say the bonus pool yields a rate that's going to be

16   paid in bonuses of five percent.

17           THE COURT:  Okay.

18           MS. MEZIAS:  The employees who then get the bonuses

19   get a five percent bonus on their regular earnings and five

20   percent on their overtime earnings.

21           THE COURT:  That's the way I understood it.  Stop

22   there.

23       Because I want to know what's your theory of liability?  It

24   seems to me you're trying to double-dip, at least your clients

25   are trying to double-dip.

```
 1          MS. GRANT:  No, we're not.

 2          THE COURT:  This is on top of what they're already

 3   being paid.  I'm trying to understand what you're alleging Home

 4   Depot is doing wrong.  I obviously didn't get it from the

 5   briefs.

 6          MS. GRANT:  It is kind of a complicated issue.

 7          THE COURT:  Assume I'm a juror.  Try to explain to me

 8   what your theory of liability is because I don't see it.

 9          MS. GRANT:  According to the fed regulations, you

10   don't have to include a bonus in the calculation of the regular

11   rate if it is based on a percentage of your earnings.

12       The Home Depot Success Sharing Plan is based on a percentage

13   of store sales.  It's distributed according to earnings.

14          THE COURT:  That's just how they come up with the

15   first number.

16          MS. GRANT:  But that is the amount of the bonus.  The

17   pie is determined by the percentage of sales.

18          THE COURT:  Right.  How much the store as a collective

19   earns.

20          MS. GRANT:  Correct.

21       And the regulations say that if you give somebody a

22   percentage of their earnings, that is a percentage bonus.  This

23   is what the regulations call a pseudo percentage bonus.  Where

24   it appears to be a percentage of earnings, but it's a percentage

25   of sales, and the pie is divvied up depending on how much you
```

1    earn.

2         THE COURT:  No.  I understand what you're saying, but

3    I just don't accept that.  That's not what the facts are in this

4    case.

5         It's based -- I mean, the initial pot of money that your

6    clients are going to share in is based on how well the store --

7    it has nothing to do with earnings.  In terms of how much are we

8    going to be able to give these employees, that's based on how

9    well the store does.

10        Now you've got this pot of money, and Home Depot then says

11   let's share it with the employees, and let's share it with them

12   on a basis of a percentage of their regular earnings and a

13   percentage of their bonus, right?

14        How are your clients not being paid what they are entitled

15   to?  I don't understand what you think Home Depot should be

16   doing.

17         MS. GRANT:  Well, they're claiming --

18         THE COURT:  As a matter of law.

19         MS. GRANT:  I'm saying that if you're going to do a

20   percentage of earnings, you don't have to pay the employees.  It

21   doesn't have to be included in the overtime rate.

22        But you're doing a percentage of sales of the store, and

23   then you're saying -- you're divvying it up among all the

24   employees according to a flat amount.

25        California law is different than federal law in many ways.

1  California law says that if you have a flat percentage, it is

2  considered a bonus that should be calculated into the overtime

3  rate.

4      This doesn't fit neatly in the federal regulation.  You say

5  it has nothing to do with it, but it does.  The federal

6  regulations exempt percentages of earnings.  There is no

7  percentage of earnings done here.  It's a percentage of the

8  store sales, and then they divide the pie up by the guy -- the

9  guy who earned the most gets the biggest part of that pie.  The

10  guy that earns the next, gets the next part of that pie.  That's

11  not a percentage.  That's a share.

12      Maybe my friend, who I've often called math man, could

13  explain it better.

14          THE COURT:  Sure.  Because the percentage and the

15  share sound like the same thing to me.  Go ahead.

16          MR. BANERJEE:  Your Honor, I think the distinction is

17  that -- the default is that a bonus should be included in the

18  regular rate for the purposes of overtime.

19      And the point of the regulation is that you can't defer some

20  payments into a, quote, unquote, bonus in order to avoid

21  overtime payments by having a lower base rate and then having a

22  higher bonus rate.

23      And that's why the carve-outs for this are very distinct and

24  narrow including what they, you know, rely on, which is 778.210,

25  about when it is considered a percentage bonus.  And the

1    specific carve-out is for giving a bonus based on a percentage

2    of earnings.

3         And here, again, the division of the pot is based on the

4    earnings, on a percentage of earnings, but it's not that

5    everybody is earning ten percent of their earnings as the bonus.

6              THE COURT:  That's where you lost me.

7              MR. BANERJEE:  If we skip that first --

8              THE COURT:  Why don't you use a real example?

9              MR. BANERJEE:  Sure.  If we skip that first step of

10   the pie and just said you earn $100,000, you get ten percent of

11   that as your bonus, then it would fit into this.

12        But it's not that.  It's that everybody in the whole store

13   earns $100,000, and some people get two percent and some people

14   are getting a five percent bonus.  It all differs depending how

15   much they're earning.

16             THE COURT:  Right.

17             MR. BANERJEE:  That's no longer a straight percentage

18   bonus where everybody gets ten percent or five percent or the

19   same amount of their bonus.

20             THE COURT:  It is a percentage.  It's a percentage of

21   what they earn.  So if I make a little more than you, then I'm

22   going to get a little bigger bonus.

23        But how does that harm?  Where is the liability?  Where is

24   the harm?  Where is the damage?  If Home Depot determines that I

25   should be making $50,000 and someone should be making $25,000,

1    and the store does really well, then if I making a little more,

2    the reality is I'm going to get a little bigger bonus.  That's

3    life.

4          MR. BANERJEE:  Understood, Your Honor.  But the harm

5    is that if you're trying to compensate somebody 50,000 instead

6    of 25,000, that's completely up to Home Depot.  But what they

7    can't do is say, you know what, I really want to only compensate

8    them $25,000 regardless of how much they work or what they're

9    earning.

10         The way to do that is to hide money in the form of a bonus

11   instead of as overtime and part of the hourly rate.  And that's

12   why in order to avoid that, you know, making sure that employers

13   don't try to get around the overtime regulations, they say, you

14   know what, you have to include all your remunerations in the

15   calculation of overtime with very narrow exceptions.  And the

16   narrow exceptions include something like everybody gets a five

17   percent bonus.

18         THE COURT:  Wouldn't this just discourage any employer

19   from distributing the bonus at all?

20         MR. BANERJEE:  Your Honor, there's a lot of ways --

21         THE COURT:  Again, not my area of expertise.  But

22   isn't there -- is there some law that says Home Depot has to

23   distribute this bonus to all the employees?

24         MR. BANERJEE:  No.

25         THE COURT:  Why wouldn't they just be better off

1   pulling it?  Your clients then would be hurt more by that,

2   right?

3           MR. BANERJEE:  No, Your Honor.  There is a lot of ways

4   they could distribute a bonus where it takes into account the

5   overtime payment and the regular payment.  They could still

6   distribute this bonus.  They would just have to incorporate that

7   into their overtime payments, or they can come up with a

8   different formula and say everybody gets a five percent bonus or

9   a ten percent bonus.

10      The point of it is, Your Honor, is that, you know, companies

11   want to encourage bonuses because they're trying to recruit

12   employees, and there's always going to be a need to do so.  But

13   we don't want to allow companies to get around overtime

14   regulations by saying this isn't your hourly rate.  This is a

15   separate amount of money that doesn't need to be incorporated

16   into overtime.

17           THE COURT:  What's wrong with their theory?

18           MS. MEZIAS:  Several things, Your Honor.

19           THE COURT:  Okay.

20           MS. MEZIAS:  First of all, the idea that this bonus is

21   paid as a percent of store sales, there is absolutely no

22   evidence of that.  The undisputed evidence is that it's a

23   percentage of their earnings.

24      What they are talking about is the bonus pool.  The bonus

25   pool can be anything.  They could pick the lottery number from

1    the night before and decide that's the bonus pool.

2         As long as it is paid as a percentage, and the same

3    percentage on both regular earnings and overtime earnings, then

4    it absolutely satisfies the requirements of a percentage bonus

5    under 778.210.  This is an area where California expressly

6    follows federal law.

7              THE COURT:  Who determines that percentage?  Home

8    Depot does, right?

9              MS. MEZIAS:  There is a formula -- what do you mean?

10             THE COURT:  The percentage to be paid.

11             MS. MEZIAS:  It is determined by way of a formula that

12   is set forth in the Success Sharing Plan that is distributed and

13   available to everyone.

14             THE COURT:  But Home Depot determined that formula?

15             MS. MEZIAS:  Yes.  Home Depot determined that formula.

16             THE COURT:  And their argument is -- still not clear

17   what their argument is -- but, in part, I hear that if Home

18   Depot just paid five percent to everyone, that would be in

19   compliance with the law as opposed to looking at someone's

20   earnings.

21             MS. MEZIAS:  I guess what they're -- I'm not sure what

22   their argument is.  Sorry to speak for you.

23        But I suppose that is it, and that they're saying it has to

24   be five percent of the salary or something as opposed to five

25   percent of something else.

1    Well, that's not what the regulation provides.  And the

2    reason is this.  When you pay a percentage on both regular

3    earnings and overtime earnings, it comes out exactly equal to if

4    you had done a recomputation of the bonus and then retroactively

5    bring it back to the -- to adjust the overtime rate -- the

6    regular rate of pay for determining overtime as you would do

7    with commissions and things like that.  The regulation

8    recognizes that's an arithmetic fact.  It comes out exactly

9    equal.  So this is absolutely an attempt to double-dip.

10       If you want, I can give you a simple mathematical example

11   that shows that.

12        THE COURT:  We're going to take a break because my

13   court reporter needs a break and I need a break.  We'll finish

14   this up, and then we'll take up the next case after this.  But

15   everybody needs a break.  So we'll be back in about ten minutes.

16        (Break taken.  3:02 p.m.- 3:19 p.m.)

17        THE COURT:  I've used the break to go over this issue

18   again in detail.  I'm prepared to rule as follows on this issue,

19   and we will go through this so the record is clear.

20       The plaintiffs and the defendants dispute whether the Home

21   Depot Success Sharing Plan bonus must be calculated into the

22   rate at which overtime compensation is paid, or, if

23   alternatively, if it fits within a recognized statutory

24   exemption.  Currently, Home Depot does not include the bonus in

25   its calculations.

1      California law requires that employers pay non-exempt

2    employees time and a half, 1.5 times the regular rate of pay for

3    time worked in excess of eight hours in a workday and for time

4    worked in excess of 40 hours in a work week.  That's California

5    Labor Code Section 510(a).  No one disagrees with that.

6      The regular hourly rate of pay of an employee is determined

7    by dividing his total remuneration for employment (except

8    statutory exclusions) in any work week for which such

9    compensation was paid.  That's 29 C.F.R. Section 778.109.

10     Exemptions to the regular hourly rate of pay calculation are

11   to be narrowly construed against the employer seeking to assert

12   them.  One such recognized exemption occurs when a percentage of

13   total earnings is paid as a bonus.

14     A percentage of total earnings bonus exists when "the

15   contract or plan for the payment of a bonus also provides for

16   simultaneous payment of overtime compensation due on the bonus."

17   29 C.F.R. Section 778.210.  That's what we have been talking

18   about here today.

19     The legislature has provided an example.  A contract made

20   prior to the performance of services may provide for the payment

21   of additional compensation in the way of a bonus at the rate of

22   ten percent of the employee's straight-time earnings and ten

23   percent of his overtime earnings.

24     The legislature has explained that in such instances

25   payments according to the contract will satisfy in full the

1    overtime provisions of the Fair Labor Standards Act and no

2    recomputation will be required.

3        There's also a case, Brock versus Two R Drilling Company.

4    Fifth Circuit case from 1986.  Where the bonus is calculated as

5    percentage of employee's wages for the period in question, the

6    bonus need not be included in the regular rate of pay.

7        In this case, we're talking about Home Depot's Success

8    Sharing Plan bonus, which is implemented as follows.  If a store

9    achieves a certain percent of its sales plan, then a certain

10    percentage of sales dollars in that range are placed in this

11    sharing pool.  If the store achieves a higher percentage, then

12    in that case a higher percent of sales dollars is placed into

13    the pool.

14        So you create this pool, and then this pool is divided by

15    the sum of all eligible store associates' earnings for the plan

16    period to arrive at a payout.  In part, this allows everyone who

17    is eligible to share in this payout.

18        The payout percent is then multiplied by each individual's

19    eligible earnings for the six-month period to get that

20    individual's actual dollar payment.  And eligible earnings on

21    which the Success Sharing percentage bonus is paid includes --

22    and this is the key -- it includes all regular and overtime

23    earnings and rest break premiums paid during the six-month

24    period covered by the bonus.

25        So the defendants contend in this case that because the

1   Success Sharing Plan bonuses were computed as a percentage of

2   both regular and overtime earnings during the bonus period, the

3   bonuses already include proper overtime -- plaintiffs' bonuses

4   already include proper overtime compensation and no additional

5   overtime pay is due.

6       The plaintiffs, on the other hand, contend that this Success

7   Sharing Plan bonus is not a percentage bonus as that's

8   contemplated by Section 778.210 but that the Success Sharing

9   Plan bonus is -- because the Success Sharing Plan bonus is a

10  flat percentage of sales, not earnings.

11      Plaintiffs have argued that the employees' earnings are only

12  used to determine how Home Depot distributes the bonus.  Indeed,

13  the earnings are both divided into the total bonus pool and then

14  multiplied by the percentage payout.

15      Plaintiffs have argued that the Success Sharing Plan bonus

16  is actually a production bonus, and they cite to this case,

17  Marin versus Costco Wholesale Corp, in support of their

18  argument.

19      In Marin, that court stated -- it's a Court of Appeals case

20  from California -- that a production bonus is based on a

21  percentage of production or some formula other than a flat

22  amount and can be computed and paid with the wages for the pay

23  period to which the bonus is applicable.  Overtime on the bonus

24  must be paid at the same time as the other earnings for the

25  week.

1          Plaintiffs then conclude that the fact that Home Depot

2     includes earnings as a factor, by dividing and multiplying by

3     it, does not make the bonus payment simultaneously a payment for

4     the overtime compensation due on the bonus.

5          In the opposition on page 23, the plaintiffs argue that the

6     Success Sharing Plan is not a percentage bonus and not exempt

7     under 778.210.  They say that the percentage bonus is distinct

8     from the type of bonus used by Home Depot.

9          And then the sentence goes on:  Here, the bonus is a flat

10    percentage of 1.5 percent or 3 percent of sales, not earnings.

11    Employees' earnings are only used to determine how Home Depot

12    distributes the bonus.  Indeed, the earnings are both divided

13    into the total bonus pool and then multiplied by the percentage

14    payout.  By dividing and multiplying the bonus by the earning,

15    Home Depot is, in actuality, neutralizing the effect of the

16    earnings on a bonus payment.

17         That's where I disagree.  What's missing is the word pool in

18    that sentence.  The bonus pool is a flat percentage.  Not the

19    bonus.  The bonus pool becomes a flat percentage of sales.  It's

20    either 1.5 percent or 3 percent, depending on how much the store

21    earned.

22         And I think plaintiffs just have it wrong in terms of how

23    this Success Sharing Plan is calculated.  There is no basis for

24    liability because the employee gets both a percentage of his or

25    her regular earnings and a percentage of his or her overtime

 1   earnings based on how much Home Depot calculates this bonus to

 2   be, which, again, is based, as we talked about, the collective

 3   amount of sales that a particular store earns.

 4       In the reply brief, the defendants argue how the success

 5   sharing pool is determined is irrelevant.  Rather, what matters

 6   is whether, as here, the individual bonuses paid from that pool

 7   are determined as a percentage of earnings, and the same

 8   percentage is applied to both straight-time and overtime

 9   earnings.  I agree completely.

10       I don't find the plaintiffs' argument in opposition

11   persuasive.  While the percentage rate is consistent among all

12   employees, that rate is then multiplied by each individual

13   employee's earnings to arrive at the total amount of bonus

14   compensation that any one particular employee receives.

15       The Success Sharing Plan bonus amount each employee receives

16   is directly based on the amount that each particular employee

17   earned, and, therefore, the Success Sharing Plan bonus qualifies

18   as a percentage bonus and is exempt from being calculated into

19   the regular rate of pay for overtime compensation.

20       Because Home Depot calculates the Success Sharing Plan bonus

21   based on both regular and overtime wages, Home Depot compensates

22   employees for the overtime earnings owed at the time the bonus

23   is paid out.

24       To hold otherwise would require Home Depot to

25   double-compensate employees for the Success Sharing Plan bonus

1   in regard to overtime compensation.  And, therefore, Home Depot

2   need not again factor in the Success Sharing Plan bonus into the

3   regular rate of pay for overtime compensation purposes as the

4   Success Sharing Plan bonus is exempt under 29 C.F.R. Section

5   778.210, unless plaintiffs can establish that Home Depot's

6   Success Sharing Plan is designed to evade overtime requirements.

7        Plaintiffs have further contended that even if the Court

8   finds, as I have, that the Success Sharing Plan is a percentage

9   bonus, that the defendants have not established that a jury

10  could not reasonably conclude that the Success Sharing Plan is a

11  pseudo percentage bonus designed to avoid overtime.  That's in

12  their opposition brief on page 24.

13       29 C.F.R. Section 778.210 states, where a percentage bonus

14  is used as a device to evade the overtime requirements of the

15  Act rather than to provide actual overtime compensation, the

16  statutory exemption is not applicable.

17       And 29 C.F.R. Section 778.503 states, that a true bonus

18  based on a percentage of total wages, both straight-time and

19  overtime wages, satisfies the Act's overtime requirements if it

20  is paid unconditionally.

21       The legislature explains that pseudo percentage bonuses are

22  generally separated out of a fixed weekly wage and usually

23  decrease in amount in direct proportion to increases in the

24  number of hours worked in a week in excess of 40 hours.

25       No such scheme is present in the Home Depot Success Sharing

1   Plan.  Defendants have demonstrated that the Success Sharing

2   Plan bonus increases both straight-time and overtime wages by

3   the same percentage, and thereby includes proper overtime

4   compensation as an arithmetic fact; thus, the defendants have

5   satisfied the Act's overtime requirements in regard to overtime

6   compensation on the Success Sharing Plan bonus as a matter of

7   law, and the Court grants summary adjudication, summary judgment

8   on this issue in favor of the defendants.

9       I will see all of you on March 8th on the next motion, which

10  is the class certification.  If the defendants want to prepare

11  an order with respect to the Court's ruling today, you may do

12  so.  A lot of times the easiest thing to do is order a

13  transcript and say for the reasons stated these are the Court's

14  rulings.

15      I'll leave it up to you.  We have a transcript.  The

16  remaining issues will be the three issues – the two that were

17  not part of this motion and then the other issue on which I did

18  not grant summary adjudication.  Thank you.

19      (End of transcript.  3:32 p.m.)

20                          CERTIFICATION

21  I, Diane J. Shepard, certify that the foregoing is a correct

22  transcript from the record of proceedings in the above-entitled

23  matter.

24                          /s/ DIANE J. SHEPARD
                            DIANE J. SHEPARD, CSR #6331, RPR
25                          Official Court Reporter
                            United States District Court