1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    SANDY BELL, MARTIN GAMA, and          No.  2:12-cv-02499-DJC-CKD
      MICHAEL HENRY, on behalf of
12    themselves and all others similarly
      situated,
13                                            PRELIMINARY APPROVAL OF CLASS
                     Plaintiffs,              ACTION AND PAGA SETTLEMENT
14
             v.
15
      HOME DEPOT U.S.A., Inc.,
16
                     Defendant.
17

18

19          This action concerns alleged unpaid overnight overtime wages by the named

20    Plaintiffs on behalf of themselves and those similarly situated.  Presently pending

21    before the Court is Plaintiffs' unopposed Motion for Preliminary Approval of the

22    Parties' Class Action and California Labor Code's Private Attorneys General Act

23    ("PAGA") Settlement.  (ECF No. 249.)

24          For the reasons stated below, the Court GRANTS preliminary approval of the

25    class action and PAGA settlement, APPROVES the Notice of Settlement, and

26    APPOINTS CPT Group, Inc. as the Settlement Administrator for this settlement.  The

27    Court will also set further deadlines.

28    ////

**BACKGROUND**

Plaintiffs Sandy Bell and Martin Gama worked for Defendant Home Depot U.S.A., Inc. as non-exempt, hourly supervisors.  Plaintiffs Bell and Gama filed the present suit alleging, among other things, that Defendant had improperly recorded shifts that went past midnight as occurring on separate workdays and thus failed to properly compensate employees for overtime when those shifts exceeded 8 hours.

Plaintiff Michael Henry also worked for Defendant.  Plaintiff Henry similarly filed suit alleging that Defendant had failed to properly provide overtime compensation for overnight shifts longer than 8 hours.

Courts separately certified classes in both the *Bell* action and the *Henry* action. These cases were later consolidated into the action presently before the Court.  The *Bell* portion of this action covers the following certified class:

> All persons who worked for Home Depot in California as a non-exempt, hourly-paid supervisor during the period from August 14, 2009 through June 1, 2016, who worked at least one overnight shift that crossed midnight of more than eight hours, and who, as a result, was not paid overtime for the hours worked over eight hours during such overnight shift.

The *Henry* portion of the action covers the following certified class:

> All persons employed by Home Depot in hourly or non-exempt positions in California during the period from September 18, 2010 through May 3, 2016, who worked a shift past midnight in which the total aggregate number of hours for that shift exceeded eight hours.

After several rounds of summary judgment, the claims remaining for both the *Bell* and *Henry* classes were violations of California Labor Code sections 203 and 226, as well as claims under the UCL and FLSA, and PAGA claims.  Plaintiffs' claims were predicated on allegations that they did not receive adequate compensation for overnight overtime shifts.

////

1    Plaintiffs have now filed an unopposed motion in which they request

2  preliminary approval of the class and PAGA settlements, approval of the Class Notice,

3  and appointment of the Settlement Administrator.  (Mot. (ECF No. 249).)  The Motion

4  also requests the scheduling of deadlines for final approval of this settlement

5  agreement.

6                           **PROPOSED SETTLEMENT TERMS**

7    Under the terms of the Settlement Agreement, the parties have agreed to settle

8  Plaintiffs' claims for a Gross Settlement Amount ("GSA") of $3,350,000.  (Mot. at 6.)

9  This is a non-reversionary settlement in which no portion of the Settlement can revert

10  to Defendant.  (*Id.*)  The settlement provides for a number of potential reductions from

11  the GSA before distribution to Class Members.  These include: (1) service payments of

12  $10,000 to each of the three Class Representatives; (2) settlement administration costs

13  of approximately $225,000; (3) up to $1,116,667 in attorneys' fees without opposition

14  of Defendant and up to $350,000 in litigation costs without opposition.  (*Id.*)  $350,000

15  in PAGA penalties are also included in the GSA.  Of this amount a payment of

16  $262,500 would be provided to the California Labor and Workforce Development

17  Agency as the 75% portion of PAGA penalties provided to the LWDA and $87,500

18  would be given to members of the PAGA Class.  (*Id.*)

19    Under the Settlement Agreement, the remaining portion of the GSA is

20  distributed to Class Members in an "opt out" setup where distributions from the GSA

21  are automatically made to Class Members unless they opt out of the class.  (*Id.*)

22  Should the Court grant the full reductions from the GSA noted above, the Net

23  Settlement Amount ("NSA") would be $1,278,333.  This amount would then be

24  distributed to Class Members on a pro-rata basis based on the number of weeks

25  worked by each Class Member during the class period.[1]  (Mot. at 7.)  Plaintiffs believe

26

27  _____

[1] A similar system is also employed for distribution of the $87,500 portion of the PAGA penalties

28  intended for members of the PAGA Class using pro-rata distribution based on the pay periods worked
by each PAGA Class Member.  (Mot. at 7.)

1   there are approximately 38,500 Class Members.  (*Id.*)  This would result in an average

2   net recovery of $33.20 for Class Members with distributions for individuals differing

3   based on the amount of time worked and the period worked.

4         Upon approval of the Settlement Agreement, Defendant will provide the

5   Settlement Administrator with contact information and data on workweeks and pay

6   periods worked during the class period for each Class Member.  The Settlement

7   Administrator will then mail, by First Class U.S. Mail, the Settlement Notice Documents

8   (the "Notice") to each Class Member.  (Settlement Agreement (ECF No. 249-1, Ex. 1) at

9   18.)  "The Settlement Administrator will use all appropriate tracing methods, including

10  skip tracing, to ensure that the Settlement Notice Documents are received by Class

11  Members" including where the Notice is returned as undeliverable.  (*Id.* at 18–19.)

12  Class Members are provided with the option to opt out or object to the Settlement

13  Agreement.  Class Members who do not opt out or object will release the stated

14  claims for the relevant period.  Pursuant to the law on PAGA claims, regardless of

15  whether a class member opts out, Class Members will release the PAGA claims.

16  Unclaimed funds from Class Members will be paid to two Cy Pres Recipients: The

17  Homer Fund and Worksafe, Inc.  (*Id.* at 7, 20.)

18                        **LEGAL STANDARDS**

19         Under Federal Rule of Civil Procedure 23, in order to approve a preliminary

20  settlement agreement, a court must determine if it "will likely be able to" both

21  (1) "certify the class for purposes of the judgment on proposal" under Rule 23(a) and

22  23(b); and (2) "approve the proposal under Rule 23(e)(2)."  Fed. R. Civ. P. 23(e)(1)(B).

23  *See Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  For classes likely to be

24  certified under Rule 23(b)(3), "the court must direct to class members the best notice

25  that is practicable under the circumstances, including individual notice to all members

26  who can be identified through reasonable effort," imposing specific requirements on

27  the contents of the notice.  Fed. R. Civ. P. 23(c)(2)(B).  After determining certification is

28  appropriate, the Court must then decide whether the proposed settlement is

1   "fundamentally fair, adequate, and reasonable." *Staton*, 327 F.3d at 952.  At the

2   preliminary approval stage, the court considers the likelihood that it will ultimately

3   approve the proposed settlement.  Fed. R. Civ. P. 23(e)(1)(B).  The determination as to

4   whether to grant final approval is given after class members have been notified and

5   given the opportunity to provide feedback.  Fed. R. Civ. P. 23(e)(2).

6          PAGA claims are fundamentally different from a class action as PAGA claims are

7   brought on behalf of a state agency.  *Baumann v. Chase Inv. Services Corp.*, 747 F.3d

8   1117, 1123 (9th Cir. 2015), *cert. denied,* 574 U.S. 1060 (2014).  PAGA actions do not

9   trigger the Class Action Fairness Act and are not subject to the requirements of Rule

10  23.  *Zackaria v. Wal-Mart Stores, Inc.*, 142 F. Supp. 3d 949, 955 (C.D. Cal. 2015); *see*

11  *Baumann*, 747 F.3d at 1123.  However, settlements of PAGA claims must still be

12  approved by the Court and the Court must ask whether the settlement of the PAGA

13  claims is "fundamentally fair, reasonable, and adequate."  *Haralson v. U.S. Aviation*

14  *Servs. Corp.*, 383 F. Supp. 3d 959, 972 (N.D. Cal. 2019); Cal. Lab. Code § 2699(*l*)(2).

15  Therefore, where there are both Rule 23 claims and PAGA claims, the Court should

16  first consider whether to certify the class for the non-PAGA causes of action, then

17  determine whether the settlement agreement satisfies the requirements of Rule 23

18  and is adequate as to the PAGA claims.  *See Almanzar v. Home Depot U.S.A.*, No.

19  2:20-cv-0699-KJN, 2022 WL 2817435, at *4 (E.D. Cal. July 19, 2022).

20                                    **DISCUSSION**

21  **I.      Certification of the Rule 23 Class**

22          Both the *Bell* and *Henry* Classes were previously certified under Rule 23.  (*See*

23  ECF No. 110; Pre-Consolidation *Henry* Action (2:16-cv-02102-MCE-AC), ECF No. 65.)

24  As a result, no further analysis as to whether the requirements for certification have

25  been met is necessary.  *See Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 974

26  (E.D. Cal. 2012).

27  **II.  Preliminary Approval of Proposed Settlement**

28          Under Rule 23(e), a court may approve a class action settlement only if it is a

1    "fair, reasonable, and adequate" resolution of the dispute, considering several factors

2    including, (1) the class representatives and class counsel have adequately represented

3    the class; (2) the proposal was negotiated at arm's length; (3) the relief provided for

4    the class is adequate; and (4) the proposal treats class members equitably relative to

5    each other.  *See* Fed. R. Civ. P. 23(e)(2)(A)–(D).  "[P]reliminary approval of a settlement

6    has both a procedural and substantive component" and is appropriate if: (1) the

7    proposed settlement appears to be the product of serious, informed, non-collusive

8    negotiations; and (2) the settlement falls within the range of possible approval, has no

9    obvious deficiencies, and does not improperly grant preferential treatment to class

10   representatives or segments of the class.  *In re Tableware Antitrust Litig.*, 484 F. Supp.

11   2d 1078, 1079–80 (N.D. Cal. 2007) (citation omitted).  Settlement agreements are

12   considered as a whole, not by their individual components.  *Lane v. Facebook, Inc.*,

13   696 F.3d 811, 818–19 (9th Cir. 2012).  Settlements that occur before formal class

14   certification are held to a higher standard of fairness in comparison to those that occur

15   post-certification.  *Id.* at 819.

16          **A.  Adequacy of Representation**

17          In certifying the *Bell* and *Henry* classes, the certifying courts necessarily found

18   that the representation provided by the Class Representatives and Class Counsel was

19   adequate for purposes of Rule 23(a)(4).  That determination is identical to the

20   adequacy of representation for purposes of Rule 23(e)(2)(A).  *Mejia v. Walgreen Co.*,

21   No. 2:19-cv-00218-WBS-AC, 2020 WL 6887749, at *6 (E.D. Cal. Nov. 24, 2020).

22   Moreover, the litigation history of this case post-certification supports the adequacy of

23   the representation provided.  Named Plaintiffs and their Counsel have vigorously

24   litigated this case.  This includes defending against and at least partially prevailing on

25   four summary judgment motions as well as obtaining reconsideration of summary

26   judgment after new facts were brought to light.[2]  Thus, there is no question that Class

27   _____

28   [2] While the Court granted Plaintiffs' Motion for Reconsideration, on reconsideration, Plaintiff did not
     ultimately succeed in obtaining a different result from the prior summary judgment order.

1    Representatives and Counsel have continued to fully prosecute this action and there is

2    no indication of any conflicts of interests.  As such, the adequacy of representation is

3    apparent.

4         The Court does note here that the Settlement Agreement contains a "clear

5    sailing" provision wherein Defendant agrees to not oppose attorneys' fees of up to

6    one third of the GSA as well as additional costs.  (Settlement Agreement at 14.)  While

7    such provisions are permissible, they are among one of the commonly cited "red

8    flags" of unfair settlements that courts use to determine where additional scrutiny is

9    required.  *See In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947

10   (9th Cir. 2011).  While historically, these "red flags" were considered to be of greater

11   concern where the settlement was reached early in litigation before class certification

12   has occurred, the Ninth Circuit has clarified that post-certification the Court must still

13   engage in the heightened scrutiny described in *In re Bluetooth* where these red flags

14   are present.  *Briseño v. Henderson*, 998 F.3d 1014, 1025 (9th Cir 2021).  The Ninth

15   Circuit recognized that post-certification there are factors which lead to reduced

16   chance that class counsel might engage in collusion with Defendants, *id.* at 1024–25,

17   but it is still the responsibility of the Court to engage in closer scrutiny in light of the

18   clear sailing provision.

19        As discussed further below, the proposed attorneys' fees appear to be

20   reasonable at this stage in light of the extensive litigation efforts that were required in

21   this case.  The Settlement is also non-reversionary.  Thus, should the Court ultimately

22   award less in attorneys' fees than permitted by the clear-sailing provision, the NSA

23   distributed to Class Members will simply increase proportionally.  The fact that the

24   attorneys' fees are taken from the GSA does create potential tension between Class

25   Counsel and Class Members, but it also reduces concerns about the adequacy of the

26   settlement itself as Counsel is naturally incentivized the obtain the maximum possible

27   settlement by virtue of their payment coming from the GSA.  Given all of these factors

28   together and particularly the vigorous litigation Class Counsel has engaged in over

7

1   the course of this 13-year-old case, the Court is satisfied at this stage of the adequacy

2   of representation.

3          However, in order to ensure the Court gives the adequate heightened scrutiny

4   to the Settlement Agreement as well as out of an absolute abundance of caution, at

5   final approval the Court will engage in a close investigation of the Settlement and the

6   attorneys' fees that are requested.  This will include conducting a "lodestar cross-

7   check" to determine if the request is reasonable, especially in light of the clear sailing

8   provision.  *See Roes, 1–2 v. SFBSC Management, LLC*, 944 F.3d 1035, 1051 (9th Cir.

9   2019).  In the forthcoming Rule 23(h) motion, Counsel shall brief their application for

10  attorneys' fees using the lodestar method as a cross-check and provide any necessary

11  supporting evidence and data to confirm Counsel's assessment.  For this cross-check,

12  Counsel should be sure to utilize the prevailing rate in the Eastern District of California

13  as compared to those used in other districts.

14         **B.  Arm's Length Negotiation**

15         Plaintiffs' Counsel state that the Settlement Agreement was created after arms-

16  length negotiations and several mediation attempts including, most recently, the

17  assistance of Hunter Hughes.  (Mot. at 3; Settlement Agreement at 4.)  Based on these

18  representations and the apparent efforts of Plaintiffs to vigorously prosecute this case,

19  the Court preliminarily finds that the settlement satisfies this factor.  *See* Fed. R. Civ. P.

20  23(e)(2)(B); *see also Chambers v. Whirlpool Corp.*, 980 F.3d 645, 669 (9th Cir. 2020).

21         **C.  Adequacy of Relief Provided to the Class**

22         Determining the adequacy of the relief requires the Court to consider four

23  factors: (1) the costs, risks, and delay of trial and appeal; (2) the effectiveness of any

24  proposed method of distributing relief to the class, including the method of

25  processing class-member claims; (3) the terms of any proposed award of attorneys'

26  fees, including timing of payment; and (4) any agreement required to be identified

27  under Rule 23(e)(3).  Fed. R. Civ. P. 23(e)(2)(C)(i)–(iv).

28  ////

8

1           **1. Costs, Risks, and Delay of Trial and Appeal**

2           In considering whether the relief provided to class members is adequate,

3   courts compare the relief under the proposed settlement to the best possible

4   outcome for the class.  *Rodriguez*, 563 F.3d at 964.  The proposed Settlement

5   Agreement provides for a non-reversionary GSA of $3,350,000.  (Mot. at 6.)  After

6   deductions for attorneys' fees, litigation costs and expenses to Class Counsel,

7   representative incentive awards, and settlement administration expenses, as well as

8   the removal of the PAGA penalties amount, the NSA is calculated to be $1,278,333.

9   (*Id.*)  Based on a class size of approximately 38,500, the average gross payment to

10  each class member is $33.20 with the actual payments determined based on the

11  proportional number of weeks worked by each individual class member during the

12  period in question.  (*Id.* at 7.)  Based on the information obtained by Plaintiffs in

13  discovery, Plaintiffs calculated that the total unpaid overtime during the period in

14  question is approximately $4,170,236.  (*Id.* at 12.)  Thus, the NSA represents 30% of

15  the maximum potential exposure on Plaintiffs' core overnight overtime claims.

16          Plaintiffs notes the "burdens and uncertainties inherent in trial" as a motivator

17  for reaching the Settlement Agreement proposed.  (Mot. at 10 (quoting *Franklin v.*

18  *Kaypro*, 884 F.2d 1222, 1225 (9th Cir. 1989)).)  These are risks that courts often

19  recognize as justifying a compromise between the parties.  Plaintiff also faces

20  additional risk in the form of the pending Motion for Reconsideration and Summary

21  Judgment filed by Defendant.  (*See* ECF No. 232.)  While the Court takes no position

22  on the merits of that Motion, such a motion could also present risks to Plaintiffs' ability

23  to recover on their claims, especially given that the Court has previously granted

24  reconsideration of summary judgment in this case on other grounds.

25          Based on the risks in litigation, the 30% recovery of the maximum possible

26  penalties is reasonable.  This recovery amount also compares comparable, if not

27  favorably, with the typical recovery in other settlements.  *See e.g.*, *Senne v. Kansas City*

28  *Royals Baseball Corp.*, No. 14-cv-00608-JCS, 2023 WL 2699972, at *6 (N.D. Cal. Nov.

1   29, 2023) (finding a post-certification and post-summary judgment settlement with a

2   recovery of between 24% and 32% of the maximum recovery to be fair and

3   reasonable); *Espinoza v. Domino's Pizza, LLC*, No. 07-cv-1601-VAP-OPx, 2011 WL

4   13180228, at *9 (C.D. Cal. Aug. 24, 2011) (stating that a roughly recovery of 30% of

5   the maximum estimated recovery in a post-certification settlement was reasonable);

6   *Ferrell v. Buckingham Property Mgmt.*, 2020 WL 291042, at *19 n.20 (E.D. Cal. Jan. 21,

7   2020) (approving a settlement of claims at the preliminary stage that represented

8   under 3% of the maximum possible valuation and collecting numerous other cases

9   ranging between 1.4% and 15%).  Considering the risks presented by the pending

10  motion and the uncertainty of trial, the Court is convinced that the recovery for these

11  claims under the Settlement Agreement is reasonable.

12      The Settlement also provides for PAGA penalties of $350,000, 25% or $87,500

13  of which would be paid to the PAGA Class.  The Motion does not provide a calculation

14  of the maximum possible exposure for the PAGA claims.  Due to the manner PAGA

15  penalties are calculated – by counting each violation per pay period for each putative

16  class member – in many cases the potential maximum exposure for the PAGA claims

17  becomes so large that it eclipses the exposure for the underlying labor law claims

18  themselves.  As a result of this, this Court and others have recognized that PAGA

19  settlements that represent a fraction of the gross settlement and of the maximum

20  potential exposure for these claims are often warranted and reasonable.  *See Botonis*

21  *v. Bimbo Bakeries USA, Inc.*, No. 2:22-cv-01453-DJC-DB, 2024 WL 100545, at *9–10

22  (E.D. Cal. Jan. 9, 2024).  Under the proposed Settlement Agreement, the PAGA

23  penalties represent a comparatively high 10% of the GSA.  Class Counsel also indicate

24  that the proposed settlement has been provided to the LWDA.  (Perez Decl. (ECF No.

25  249-1) ¶ 18; ECF No. 249-3.)  These factors lead the Court to find that at this stage that

26  the Settlement is sufficient as to the PAGA penalties as well.[3]  However, in seeking final

27  _____

28  [3] Although the court does not evaluate the settlement of PAGA claims under the Rule 23 criteria, it must
    still inquire into the fairness of the PAGA settlement.  "[I]n reviewing a settlement that includes both a

1    approval, Plaintiffs must provide an update on the LWDA's response to the Settlement

2    Agreement as well as a calculation of the possible maximum PAGA penalties under

3    the information available.

4        Given the above, the costs, risks, and delay of any potential trial weigh in favor

5    of settlement.

6            **2.  Effectiveness of Proposed Method of Distributing Relief**

7        In determining the adequacy of the relief provided to the prospective class, the

8    Court must consider "the effectiveness of any proposed method of distributing relief

9    to the class, including the method of processing class-member claims[.]"  Fed. R. Civ.

10   P. 23(e)(2)(C)(ii).  The parties have proposed Settlement Notice Documents which will

11   be distributed to Class Members by the Settlement Administrator as provided by the

12   Settlement Agreement.  (Notice (Settlement Agreement, Ex. A).)  The Notice provides

13   information about the Settlement Agreement including how the settlement was

14   reached, the Settlement Agreement's terms, and expected distribution to putative

15   class members.  (*Id.* at 1-3.)  It also informs the recipients about their options, the

16   process and deadlines for submitting an objection or request for exclusion, what

17   claims will be released if they consent to settlement, and that potential PAGA claims

18   will be released regardless of whether they receive a distribution or opt out of the

19   Settlement.  (*Id.* at 4-5.)  It also provides contact information for the Settlement

20   Administrator and Class Counsel for Class Members to use in case they have

21   questions about the Settlement.  (*Id.* at 5-6.)

22       Under the Settlement, Class Members receive a pro rata portion of the NSA

23   based on the number of workweeks they worked during the period in question

24

25   Rule 23 class and a PAGA claim, the court must closely examine both aspects of the settlement."
     *O'Connor v. Uber Technologies, Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (emphasis in
     original).  Based on the best guidance at hand–from the LWDA's input in *O'Connor*, in the absence of a

26   definitive governing standard–district courts typically apply "a Rule 23-like standard" asking whether
     the settlement of the PAGA claims is "fundamentally fair, reasonable, and adequate."  *Haralson*, 383 F.

27   Supp. 3d at 972; *see also, e.g., Mondrian v. Trius Trucking, Inc.*, 2022 WL 2306963, at *7 (E.D. Cal. June
     27, 2022) (noting lack of a binding standard for approving PAGA settlements and adopting

28   "fundamentally fair, reasonable, and adequate" standard based on LWDA's *O'Connor* commentary).

1  compared to the total number of workweeks worked by all Class Members.

2  (Settlement Agreement ¶ 14.)  PAGA Class Members will receive a distribution based

3  on a similar system using pay periods as opposed to workweeks.  (*Id.* ¶ 45.)  The

4  Settlement Agreement is setup as an opt out settlement, meaning that Class Members

5  will receive payment without taking any action unless they cannot be located or elect

6  to opt out of receiving a distribution.  Class Members also have the opportunity and

7  right to challenge the calculation of their workweeks worked and/or pay periods

8  worked during the period in question.  (*Id.* ¶ 86; Notice at 3–4.)

9       The proposed methods of distributing relief to class members are effective and

10  are tailored to the strength of individual class member claims.  *See* Fed. R. Civ. P.

11  23(e)(2)(C)(ii).  The proposed method is tailored to provide compensation based on

12  the relative strength of each class member's claims.  Class Members will have the

13  opportunity to challenge and correct inaccuracies in the amount of time they worked.

14  The procedures set by the Settlement Agreement will ensure distribution to all

15  reasonably ascertainable class members and does not require that Class Members

16  take any additional unnecessary steps to attain relief.  As  such, it satisfies the factors

17  under Rule 23(e)(2)(C)(ii).

18          **3.  Terms of Proposed Attorney Award**

19       The Settlement Agreement provides that Class Counsel may request up to

20  33.3% (or $1,116,667) of the GSA without opposition from Defendants.  (Settlement

21  Agreement ¶ 71.a.)  "[C]ourts typically calculate 25% of the fund as the 'benchmark'

22  for a reasonable fee award."  *In re Bluetooth*, 654 F.3d at 941.  "Selection of the

23  benchmark or any other rate must be supported by findings that take into account all

24  of the circumstances of the case."  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048

25  (9th Cir. 2002).  When assessing whether the percentage requested is reasonable,

26  courts look to factors such as (1) the results achieved; (2) the risk of litigation; (3) the

27  skill required, (4) the quality of work; (5) the contingent nature of the fee and the

28  financial burden; and (6) the awards made in similar cases.  *Vizcaino*, 290 F.3d at 1047;

1  *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990).

2           Class Counsel's anticipated request for attorneys' fees exceeds that standard

3  25% benchmark employed in this district.  However, assessing the factors outlined

4  above, Counsel's request appears warranted, at least for purposes of preliminary

5  settlement approval.  Class Counsel has achieved a multi-million dollar settlement in

6  an action that is over a decade old and has been subject to extensive litigation.

7  Counsel was previously successful in obtaining class certification and defending

8  against extensive motion practice from Defendants.  As detailed previously, there are

9  risks inherent in proceeding to trial as well as in the present pending Motion before

10  the Court.  Finally, this attorneys' fee request is not beyond what has been awarded by

11  other courts in this Circuit when circumstances warrant it.  *See e.g.*, *In re Pac. Enters.*

12  *Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995); *Carlin v. DairyAmerica, Inc.*, 380 F. Supp.

13  3d 998, 1006 (E.D. Cal. 2019); *Rodriguez v. Penske Logistics, LLC*, No. 2:14-cv-02061-

14  KJM-CKD, 2019 WL 246652, at *10 (E.D. Cal. Jan. 17, 2019).  Moreover, the

15  Settlement Agreement specifically notes that should the Court not approve the full

16  amount requested "any amounts not approved will be reallocated to Settlement Class

17  Members as part of the Net Settlement Fund, and the amounts awarded will not affect

18  approval of the Settlement Agreement." (Settlement Agreement ¶ 71.d.)  Thus,

19  should the Court determine that a lesser amount in attorneys' fees is warranted, this

20  determination will not prevent final approval of the Settlement Agreement and any

21  funds not allocated to Class Counsel will instead be added to the NSA and be

22  distributed to Class Members.

23           In light of these factors, the Court finds that the proposed attorney award is

24  reasonable at this time, though it withholds a final determination on that issue.   As

25  noted above, the presence of a clear sailing provision mandates that the Court

26  engage in a close examination of the Settlement Agreement and the attorneys' fees

27  request to ensure that it is fair, reasonable, and adequate.  The Court will thus employ

28  a lodestar cross-check, as ordered earlier, to ensure the that the attorneys' fees

1    awarded and the Settlement Agreement in general are reasonable.  Parties are

2    cautioned that the Court will conduct a close examination of the Settlement and

3    attorneys' fees at the final approval stage.

4           **4.  Agreements Made in Connection with the Proposal**

5          The Plaintiffs identifies no other agreements made in connection with the

6    proposed Settlement Agreement.  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv), (e)(3).  This

7    weighs in favor of approving the settlement.

8          **D.  Equitable Treatment of Class Members**

9          The fourth factor addresses whether the proposed Settlement Agreement

10    "treats class members equitably relative to each other."  *See* Fed. R. Civ. P. 23(e)(2)(D).

11    This inquiry considers both equity across sub-categories, or segments, of the class,

12    and equity between class representatives and unnamed class members.

13          The Settlement Agreement does provide for payment to Class Members based

14    on different periods for the *Henry*, *Bell*, and PAGA classes.  However, these

15    differences stem from the different periods approved as part of class certification for

16    the *Henry* and *Bell* classes as well as the limitation on the period of PAGA claims.  Each

17    of these classes is paid using largely identical systems for calculation.  The reason for

18    the distinction between these groups is logically permissible based on the different

19    class periods in question and the legal constraints of the PAGA claims and not an

20    indication of preferential treatment.  *See In re Tableware Antitrust Litigation*, 484 F.

21    Supp. 2d at 1079–80.

22          The Settlement Agreement also provides for an incentive to the named

23    Plaintiffs in the form of $10,000 each.  Such awards are considered typical in class

24    action cases and are intended to "compensate class representatives for work done on

25    behalf of the class, to make up for financial or reputational risk undertaken in bringing

26    the action, and, sometimes, to recognize their willingness to act as a private attorney

27    general."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).  The

28    Court must still consider the propriety of the incentive awards based on the actions of

1    the named Plaintiffs in protecting the class's interests, the benefit the class has

2    received from those actions, and the time and effort expended by named Plaintiffs in

3    pursuing litigation. *Staton*, 327 F.3d at 977; *see Radcliffe v. Experian Info. Solutions,*

4    *Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013) ("[D]istrict courts must be vigilant in

5    scrutinizing all incentive awards to determine whether they destroy the adequacy of

6    the class representatives."). A $10,000 incentive award is within the range of what is

7    typically awarded. *See e.g.*, *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267

8    (N.D. Cal. 2015) ("Incentive awards typically range from $2,000 to $10,000.").

9    Moreover, collectively these incentive awards represent approximately 0.89% of the

10   GSA and Courts have generally found that around incentive awards for the service of

11   class representatives is permissible. *See Huebner v. Mantech Int. Corp.*, 15-cv-9889-

12   PA-SSx, 2017 WL 11633730, at *8 (C.D. Cal. July 29, 2017). As such, this additional

13   compensation is within normal bounds and justified by the time and effort the Class

14   Representatives spent in bringing this case, litigating it, and reaching this settlement.

15   *See Flores*, 2021 WL 1985440, at *6. However, the Court again notes that it will

16   engage in a close examination of the Settlement Agreement and all of its terms,

17   including the incentive awards, at the final approval stage.

18        **E.  Additional Factors**

19        The Ninth Circuit has articulated other factors not explicitly listed in Rule

20   23(e)(2) to be considered when determining whether to preliminarily approve a

21   proposed class settlement. *See In re Volkswagen*, 895 F.3d at 610 n.18 (quoting the

22   additional factors listed in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (1998)

23   before the Rule 23(e)(2) factors had been created). Most of these factors, such as the

24   strength of Plaintiffs' case, the risk, expense, complexity, and likely duration of further

25   litigation the risk of maintaining class action status throughout the trial, the amount

26   offered in settlement, and the experience and views of counsel, *see id.*, have already

27   been addressed above, *see supra* Discussion II.A–C. The additional factors that have

28   been identified by the Ninth Circuit also weigh in favor of approval.

15

1    As to "the extent of discovery completed and the stage of the proceedings[,]"

2    *see In re Volkswagen*, 895 F.3d at 610 n.18, this settlement occurred after the

3    completion of discovery, class certification, and several rounds of summary judgment.

4    As such, this factor weighs in favor of approval at this stage.

5    There have, thus far, been no objections or requests to opt out of the proposed

6    settlement agreement.  Thus, the "the reaction of the class members to the proposed

7    settlement[,]" *see In re Volkswagen*, 895 F.3d at 610 n.18, also weighs in favor of

8    approval at this stage.  However, the Court will engage in a deeper consideration of

9    this factor after Class Members have been provided with notice of the Settlement

10   Agreement and information on how to object to or opt out of the Settlement.

11   As mentioned previously, Counsel represents that they provided the proposed

12   settlement agreement to the LWDA as required by the California Labor Code.  *See*

13   *Flores*, 2021 WL 1985440, at *7 (citing Cal. Lab. Code section 2669(k)(2)).  As such,

14   "the presence of a governmental participant" as a factor also weighs in favor of

15   approving the settlement.  *See In re Volkswagen*, 895 F.3d at 610 n.18.  At final

16   approval, Parties should be sure to provide the Court will full information on any

17   response or lack of response from the LWDA to the Settlement Agreement.

18   In sum, the Rule 23(e)(2) factors and additional factors previously articulated by

19   the Ninth Circuit weigh in favor of granting preliminary approval to the proposed class

20   Settlement Agreement.  The Court also finds that the settlement of the PAGA claims is

21   fundamentally fair, reasonable, and adequate.  *See Haralson*, 383 F. Supp. 3d at 972.

22   **III.    Settlement Administrator; Notice to Class/PAGA Members; Fairness**

23   **Hearing**

24   **A. Settlement Administrator**

25   To ultimately approve a class action settlement, a district court must ensure

26   class members were notified of the proceedings, had the opportunity to opt out or

27   object to any of the settlement's terms, and were provided the chance to appear at

28   the fairness hearing.  Fed. R. Civ. P. 23(e)(1)–(5).  To effectuate the settlement

procedures identified in the Settlement Agreement and administer the settlement, the parties have agreed to retain CPT Group, Inc. as a settlement administrator.  (Mot. at 2.)  The parties represent that the settlement administration expenses are estimated to be $225,000.  (Settlement Agreement ¶ 57.)  This amount is not outside the bounds of what could be considered to be reasonable settlement administrator fees and costs. *See e.g.*, *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 582 (N.D. Cal. 2015) (approving $140,000 in administrator expenses on a $1,250,000 settlement). However, on their face, the settlement administrator expenses appear higher than some other roughly comparable cases, even those involving the same settlement administrator.  *See Oliveira v. Language Line Services, Inc.*, --- F.Supp.3d ----, 2025 WL 586589, at *12 (N.D. Cal. Feb. 24, 2025) (granting final approval for a $50,000 in settlement administration costs for a settlement with a class size of roughly 11,000 class members and gross settlement of $3,725,000).  Naturally, the Court is not privy to all the intricacies of the details and reasons for the bids received from potential settlement administrators in this or other cases.  As such, this alone does not suggest that the expenses are unreasonable.  It is also not unusual for early estimates of settlement administration expenses to exceed the actual costs incurred by a settlement administrator.  However, to ensure that the settlement administration expenses are reasonable, when seeking final approval Plaintiffs should provide the Court sufficient information from CPT Group to confirm the settlement administration fees and costs incurred in executing the notice and distribution portions of this settlement.  The Court approves CPT Group, Inc. as Settlement Administrator of this class settlement.

### B.  Notice to Class Members

When accepting a proposed settlement under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Individuals who would be bound by a settlement agreement must have the opportunity to remove themselves from the class.  *Ortiz v.*

1  *Fibreboard Corp.*, 527 U.S. 815, 848 (1999).  For settlements under Rule 23(b)(3), the

2  court is required to:

3           [D]irect to class members the best notice that is practicable
            under the circumstances, including individual notice to all

4           members who can be identified through reasonable effort,
            [by] United States mail, electronic means, or other

5           appropriate means, [concerning] the nature of the action;
            the definition of the class certified; the class claims, issues,

6           or defenses; that a class member may enter an appearance
            through an attorney if the member so desires; that the court

7           will exclude from the class any member who requests
            exclusion; the time and manner for requesting exclusion;

8           and the binding effect of a class judgment on members . . . .

9  Fed. R. Civ. P. 23(b)(3); *see also* Fed. R. Civ. P. 23(e)(4) and (5) (requiring the court to

10  provide class members with an opportunity to be excluded from the settlement or

11  object to the terms).  A class action settlement notice "is satisfactory if it generally

12  describes the terms of the settlement in sufficient detail to alert those with adverse

13  viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v.*

14  *Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citations

15  omitted).

16           Here, the Settlement Agreement provides that within 30 days of the entry of this

17  order, Defendant will provide the Settlement Administrator with information on each

18  Class Member including any known contact information and data on the workweeks

19  and pay periods worked.  (Settlement Agreement ¶ 80.)  Prior to mailing notices, the

20  Settlement Administrator will perform an update on potential addresses for Class

21  Members using the National Change of Address database and other resources.  (*Id.*

22  ¶ 82.)  Within thirty days of receiving the class information from Defendant, the

23  Settlement Administrator shall mail the Notice to Class Members.  (*Id.* ¶ 83.)

24           The Notice describes the nature of the lawsuit and claims at issue (Notice at 2),

25  defines the class (*id.* at 1), explains the amount of the Settlement and how individual

26  class member settlement payments will be calculated (*id.* at 3–4), discloses all

27  deductions that will be requested from the Settlement for fees, costs, service awards,

28  and settlement administration expenses (*id.* at 3), details the claims that are being

1    released (*id.* at 4–5), explains how an individual can request exclusion from the class

2    (*id.* at 5), explains how a class member can object to the settlement (*id.* at 4–5),

3    provides a procedure for challenging the calculation of months worked (*id.* at 3–4),

4    discloses the time and place of the final approval hearing (*id.* at 5), displays the

5    contact information for Class Counsel (*id.* at 6) and the Class Administrator (*id.* at 5),

6    and advises that the Settlement Administrator or Class Counsel may be contacted to

7    answer questions about the Settlement (*id.* at 5-6).  The Court finds that the Notice

8    meets the requirements for such a notice under Rule 23 and that the means for

9    distribution of the Notice are similarly sufficient.  Fed. R. Civ. P. 23(b)(3), (e)(4)–(5);

10   *Churchill Vill.*, 561 F.3d at 575.

11        However, the Court does note that the Notice appears to contain two material

12   typos.  First, on Page 3 of the Notice, within the section "Proposed Settlement Terms"

13   summarizing the key deductions from the GSA, the Notice states that "[a]fter

14   deducting the above payments, a total of approximately $200,000 will be allocated to

15   Class Members who do not opt out of the Settlement Class ('Net Settlement Fund')."

16   (Notice at 3.)  After removing the full deductions and excluding PAGA penalties, the

17   NSA under the Settlement Agreement is $1,278,333.  Second, within that same

18   section, the Notice states that Settlement Administrator fees and expenses are

19   "currently estimated at $1,000."  (*Id.*)  As discussed, the current estimate for this

20   amount provided by the parties is $225,000.

21        In light of these errors, the Court will order that the Notice be updated to fix

22   these errors.  A corrected notice should be submitted to the Court for approval within

23   seven days of this order.

24        **C.  Further Scheduling and the Fairness Hearing**

25        "Courts have long recognized that settlement class actions present unique due

26   process concerns for absent class members."  *In re Bluetooth*, 654 F.3d at 946.  To

27   protect the rights of absent class members, Rule 23(e) requires the court to approve

28   such settlements "only after a fairness hearing . . . ."  *Id.*; Rule 23(e)(2).

For clarity, the Court now reiterates some of the remaining deadlines in the Settlement Agreement, the Notice, and the parties' proposed order. This section only memorializes a few of the key dates in the Settlement Agreement.

| | |
|---|---|
| Deadline for defendant to provide to Settlement Administrator all required information about the putative class members. | **_Thirty (30) days from the date of this order._** |
| Deadline for mailing of Notices by the Settlement Administrator. | **_Thirty (30) days after receipt of the Class Data._** |
| Last day for Class Counsel to submit motion for attorneys' fees and costs. | **_Fourteen (14) days prior to deadline for Class Members to opt out or file objections_** |
| Deadline for Class Members to opt out of the settlement or file objections. | **_Sixty (60) days after mailing Settlement Notice Documents._** |
| Fairness Hearing Date. | **October 16, 2025 at 1:30 p.m.** |

## CONCLUSION

For the above reasons, it is HEREBY ORDERED that:

1. Plaintiffs' unopposed Motion for Preliminary Approval of Settlement (ECF No. 249) is GRANTED;

2. Named Plaintiffs and their Counsel are confirmed as Class Representatives and Class Counsel;

3. CPT Group, Inc. is appointed as Settlement Administrator for this class action settlement;

4. The Settlement Agreement (ECF No. 249-1) is preliminarily approved as fair, reasonable, and adequate;

5. The parties' plan for notice to the class is the best notice practicable and

satisfies the due process concerns of Rule 23;

6.  The parties are ordered to submit a revised Notice within seven days of this Order; and

7.  The parties shall follow the deadlines set herein, as delineated by the Settlement Agreement.  A Fairness Hearing is scheduled for October 16, 2025, at 1:30 p.m., in Courtroom 7 of the Matsui Courthouse, 501 I. St., Sacramento, CA, 95814 before District Judge Daniel J. Calabretta.

IT IS SO ORDERED.

Dated:  __**May 30, 2025**__

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC1 – bell12cv02499.prelim_class_settlement

21